**FILED**

FEB 2 7 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Margaret I. Tildon**
**5020 Sheriff Road, N.E.**
**Washington, D.C. 20019-5539**
**202-398-8709**

Case: 1:08-cv-00346
Assigned To : Collyer, Rosemary M.
Assign. Date : 2/27/2008
Description: Employ. Discrim.

JURY ACTION

**vs.**

**Lt. Gen. Keith B. Alexander, Director**
**Department of Defense**
**National Security Agency**
**9800 Savage Road**
**Fort George G. Meade, MD 20755-6000**

## COMPLAINT

**(see attached papers)**

**RECEIVED**

FEB - 5 2008

**Clerk, U.S. District and**
**Bankruptcy Courts**

I, Margaret I. Tildon, an Afro-American woman, began working at the National Security Agency (NSA) in 1982, and resigned from the agency in 1994. While working at NSA, I switched between two job titles: special research technician (title later changed to "intelligence research analyst") and computer systems programmer (which I learned later while in my first programming office was not business applications programming which I had pursued in college). To see differences in programming types, reference the enclosed "command page" and other "systems assignments." I became a computer systems programmer in 1983 and continued in that position until November, 1985. I received a promotion in August, 1985 while at the same time applying to leave the agency so that I could pursue business applications programming. I could not understand why I was not being able to obtain interviews for that area of programming which I had pursued in college. As time progressed, I was placed into a "C" language course for computer systems programmers. However, I could not concentrate or test my programs for the course (which was in late October to November, 1985) because of constant harassment by a co-worker, Kenneth Ramp.

Although I am not positive when the deteriorating situation with NSA began, I believe it started when I spoke of a vanpool incident that

1

occurred while I was riding with a group of NSA workers to work down

the Baltimore-Washington Parkway (sometime between 1983 and 1985).

I thought a heated encounter in the van between two ladies could have

made the ride very dangerous for the rest of the riders in the van, and I

had mentioned the incident to one of my former co-workers (Laverne

Ford). The next thing I knew, I was receiving a telephone call from one

of the vanpool riders (Irma Jackson) about something I supposedly said

about one of the ladies who was a friend to both of them, and several

other individuals, but with a twist to the story. Prior to this time,

William Stroh, one of the supervisors in my office, had informed me

that I was doing a "great job" with my programming. Soon after this

incident, however, he changed his tune, and said, quote: "I don't think

you know anything about programming!" Laverne Ford, Irma

Jackson, Delores Watts (the wife of the EEO director at that time), and

Bernice Daft (my first programming office division chief), on occasion,

used to eat lunch together, and they knew the two ladies involved in the

vanpool incident. Apparently, all of them did not understand the

impact about what I was trying to say about the incident, and initiated

events that progressed from bad to worse down through the years. The

later harassment incident appears to me to look like part of the scheme

to get me out of Mrs. Daft's office, which I decided I would do after being hit in the eye, face and shoulders with rubber bands and finding strips plastered all over my computer. However, they do not have the right to blacklist me from an area of study I had taken before coming to NSA, and had continued to take after leaving NSA. I have never used business applications programming at NSA. I have passed business applications programming courses at the University of the District of Columbia before coming to NSA and "C" at Prince George's Community College (for business tasks) after leaving NSA.

The subsequent harassment incident occurred while the division chief (Bernice Daft) was supposed to have been in England. Upon Mrs. Daft's return from England, I advised her of the harassment and showed her one of the strips I found on my computer screen. From the sun reflecting on a glass desk cover in her office to a flexi-glass, or plexiglass, panel on her door, I observed her trying to smudge fingerprints she thought she could see on the strip, obviously, to protect those individuals involved in the harassment. Then, the strip was returned to me. Prior to trying to send the strip to the Baltimore court, I made a copy of the strip in an envelope. It was red with white lettering. I did this in case it was to become lost in the mail, like earlier

mail I sent previously about NSA, which disappeared. In this way, NSA would not be able to say that the strip never existed. NSA has attempted to derail this case involving discrimination at every step of the way, especially when I wanted the case taken to federal court. Kenneth Ramp had been persistently shooting rubber bands at my face and shoulders (upon my return from class to the office) while I was taking this course, and one rubber band eventually struck me in my right eye. At the same time, I would also find strips on my computer when I returned from class. Kenneth and another co-worker (Jim) were given the task of putting these strips on machines for identification purposes. Therefore, because of the constant harassment, I dropped the course while at the same time continuing to apply for the other type of programming I had taken in college. The harassment was reported to the internal Inspector General's (I.G.) office as well as the internal E.E.O. office (under the direction of Mr. Richard Watts). The I.G. office said it found nothing, but I believe I was lied to by this office. The following sections describe the scenario of what I know and saw that took place.

In 1987, I went into the Washington Hospital Center (WHC) for emergency surgery, and recuperated at home for two months. At the

end of this period, unsolicited "notices of availability" (for computer systems work, see papers) were sent to my home to force me off of the OPM register for computer scientists. It was near this time for me to renew my rating on the OPM computer scientist register (I later learned that this register was for physical sciences and engineering types, not for students who were registered in schools of business). When I did mail my correspondence to have my rating updated, I placed a copy of the rating in a mailbox outside of NSA headquarters at Fort Meade. Upon calling OPM, I learned that OPM never received it, and I had a tracer placed on it (as well as a birthday card with a check inside I had sent to a cousin, which also was never received by my cousin). I reported this incident to the IG office, but the IG said that he didn't think anyone would attempt to tamper with the mail. After I received a transfer from the first programming office in which I had been harassed (back into the position of intelligence research analyst in a different office), I was seated at my desk behind a large white column and a cabinet. There was a crack space between the column and cabinet. I had asked the IG if his office could wiretap internally to see if someone was doing this, and he said his office didn't do wiretaps. However, one day shortly thereafter, my former white male supervisor (William Stroh), whom I

5

had also reported in the harassment incident, came rushing into my office, and went straight to a black female supervisor (Delores Watts), and could be overheard telling her, quote: "He (or they) tried to force her off of the federal register." Later, this female supervisor, and others, was re-assigned to other offices. In addition, a certain gentleman, who used to frequent my former programming office to visit either his wife, or girlfriend, was never seen again in the agency. I do not know his name, but would recognize his face. I do not know if he was fired from the agency.

After being transferred back into intelligence research, I continued to apply for outside positions (not all in programming or intelligence research), and could not get an interview for anything with the federal government or the private sector. I had received two special performance cash awards in the area of intelligence research, for which the agency tried to retain me. The performance evaluations were always glorified for this area for me while working for the agency, but whenever I applied for this position outside of NSA, I was never able to obtain an interview. I re-applied back inside NSA to see what would happen, and it was as if, on cue, NSA was waiting for this to happen so that it would appear that I was interested in working for them.

However, the enclosed partial listing of job interests reveals that I was, and still am, interested in obtaining a full-time job with benefits outside of NSA. The next programming office, which was also systems programming, tried to write up something on me through an informal counseling statement, and that was when Attorney Alan Banov filed federal charges against the agency (see last sentence of letter to Mrs. Minnie Kenney (deceased) where Attorney Banov questions the agency for trying to "bad-mouth" me for future employment opportunities). As soon as I tried to seek any programming positions, it was frowned upon by some of these supervisors, and inevitably, they were usually trying to find something "negative" to promote about my programming skills (even my business applications skills, which I had not used). NSA was determined to try to keep me in "intelligence research" for their agency only.

Documents about my medical condition, obesity, work ethic, etc. were located, supposedly, in my official personnel folder and elsewhere within NSA. During the times of my surgeries, my doctors advised me not to lift or push any items heavier than 20 pounds, and whenever they thought it appropriate to lift or push anything after that time, was determined by my doctors and the condition I was in. I have had

several operations in the abdominal area which cut across major muscles. I have had carpal tunnel surgery (while working for NSA on my right hand and wrist, and later after leaving NSA on my left hand and wrist). Since leaving the agency, I have been diagnosed with lumbar disc disease, a spinal condition in which I have a bulging disc and degenerative disc disease. My doctors have warned me to be very careful with any type of movement because I could lose my ability to walk. I have been through several therapy sessions for my spinal condition, the most recent session occurring at the National Rehabilitation Hospital (N.R.H.) this past summer (2007). The production of these hidden documents had to have been done after I reported the harassment incident to the IG in retaliation. All of these supervisors knew each other. It was meant to destroy my career, life, or any movement into any occupational area. Even before Judge Harold Greene's (deceased) was making his ruling, the agency attempted to have me take a psychological examination just to get back at me for reporting the harassment. They were determined that they were not going to follow any decision made by Judge Greene. There was even a paper (written at one time) by Denise Bishop Lucius (a former co-worker) about my work performance in an area of programming I did

8

not take in college, and did not want to continue in at NSA. I sent these papers, and others, to members of the Senate Intelligence Committee in Congress (Congresswoman Harman's office, which I can only assume did not receive my papers, did not respond. I do not know if her office received the papers). The only person who responded was Delegate Eleanor H. Norton. I, subsequently, gave her permission to seek information about me from NSA under the Privacy Act and FOIA. However, I understand from a representative of her office, that NSA has not fully responded, or refuses to send any records or papers, to the FOIA request. Therefore, I am asking the court to intervene again. Instead of allowing me to obtain an interview in my college area of training since I was not doing this type of programming for NSA, NSA continued, or is trying to continue, to keep derogatory information about me in hidden files, or is spreading derogatory remarks about me "orally" (see the Transcript of Proceedings). As soon as I applied to seek interviews and/or job offers elsewhere, I was blocked from outside employment. I do not know if this was a policy NSA took to keep minorities confined to the agency because it did not have many minorities on board who could pass their tests, or just a policy that they were not going to allow minorities to leave the agency and go elsewhere,

whether they had good or bad evaluations, just to improve their minority statistics. However, the removal of some of these documents by court order, which would impede a person's employment prospects or advancement, did not stop the agency from continuing to retaliate against me. As you will notice from the affidavit of Richard Jackson, "oral" and/or "word-of-mouth" statements are later being mentioned about me or my work performance. This was being passed from one supervisor to another.

Before coming to NSA, I had previously worked for the following agencies: the old Civil Service Commission (now OPM), Agency for International Development (A.I.D.), International Trade Commission (I.T.C.), Harry Diamond Laboratories, Federal Trade Commission (F.T.C.), National Archives and Records Administration, and the Naval Weather Service. Some were summer positions and others were regular positions. The regular positions all had health and other benefits attached to them. Because of the continuing situation with NSA, I have now lost, or been cancelled (on 9/30/2007), health benefits with CareFirst BlueCross BlueShield, which I had had my entire adult life. BlueCross BlueShield had covered the bulk of the many major and minor operations (surgeries) I have had performed down through the

years. My medical condition is one major item of contention I had had with NSA. NSA had one of their doctors agree with my condition, while on the other hand, there seemed to be conflict over the amount of disability I had endured following surgery by my doctor and their doctors. Some of the underlining causes for these conditions were from the time I was being developed in my mother's womb, which were out of my control. Major surgery continued, even after I left the agency (see enclosed papers).

I have even applied for positions I had held before in the federal government (clerk-typist, secretary, archives technician, and stenographer) before coming to NSA and have heard absolutely nothing. I have also enclosed a partial listing of places where I had applied for various positions down through the years. There was even one position in which I was being tentatively offered $36,000+ by the U.S. Secret Service (see paper) which later dissipated into thin air. Even after NSA was notified about the difference in the type of programming (whether it was on the engineering or business side), I was still blocked from getting substantive interviews of any kind. Several of my co-workers received non-NSA job offers while I could not,

11

no matter what my performance evaluations stated.  I had even attempted to start a business where I could utilize my typing skills.

As you will be able to see, there was a concerted effort to keep me from going any place outside of NSA after the reporting of the harassment incident.  Whether I had left the agency earlier rather than later in my career, the result would have been the same:  to block me at all costs.  I believe the enclosed papers will show a pattern of varying degrees of discrimination.

As noted by the enclosed papers (see Richard Jackson's statements), if the agency maintains that no office at NSA used COBOL the way I was maintaining that I was trained in college, they should have been more than willing to release me or not block my way to business applications programming.  If no office was using COBOL, why was it written into my performance evaluations by William Stroh?  Instead, the agency chose to block me from everything (any type of job).  If evaluators had noted on my transcripts that I was enrolled in the School of Business where I took my computer classes, everyone would have known that my computer training was different.  I had not received a job description for my first programming position, so I did not know that that office was a computer systems office until after I was

on board in that office. I tried hard after that to apply for outside jobs to be able to leave the agency, even before the harassment incident occurred in 1985. The agency took steps after the incident to try to derail discrimination charges.

I have also given approval for an individual (who happens to hold credentials as an attorney with congressional experience) to receive papers from my former agency about me this past spring (2007), and I understand, under the FOIA, that the agency either has refused to respond, or is trying to ignore, this request. At the same time, I had asked this individual if the death of my mother, who passed in August, 2005, could also be investigated (hospital papers were also sent to this individual) because she had been trying to assist me with my case against NSA. I also have not received any response to this request, and do not know if her death was/is in any way associated with the problem I have been having with NSA. The family had requested an autopsy report as well through this representative's intervention from George Washington University Hospital, which it has never received. The congressional office where I remitted some papers informed me that it does not return papers. I do not understand now why this office wishes to retain my papers if it has no intention of using them. I do not know if

this is normal practice for congressional offices, but I had phoned that office and attempted to retrieve all papers (papers related to prospective employment and my mother's medical papers).

I had explained the programming difference to the agency. That was one reason why the Protocol Office at NSA had approved my SF-171 and resume (see stamp at top of first page of SF-171 and stamp on resume). I did not know that an individual could not apply for what he/she had taken elsewhere in college or at the university and passed! My transcripts will show that I was taking programming courses in the Schools of Business at both the University of the District of Columbia (U.D.C.) and Prince George's Community College (P.G.C.C.). At P.G.C.C., records will also show that I took Introduction to Programming (received hands-on training in "C" language) in the business area and passed! It is only retaliation being used against me because I reported the earlier incident of harassment against me concerning a co-worker, and the reaction of a particular supervisor to the harassment. This supervisor actually spoke to the harassing co-worker, turned toward the wall with the harasser, and both laughed together about the incident. Not once did this supervisor ask me what had happened, or how I was doing after being struck in the eye. Then,

14

this supervisor had the audacity to write an evaluation of my work performance, and dropped my rating!  I promptly wrote my objection to his evaluation, which I then saw as racist!  When I had previously asked the harasser (Kenneth Ramp) to stop bothering me, he responded, quote: "What are you going to do about it?"  Not once did he apologize for the harassment!

As documents are read for this case, you will be able to tell by remarks in Richard Jackson's affidavit that he speaks of "computer engineering" which is totally different from my training in "business applications programming."  In the training of which I am speaking, the area did not hinge primarily on heavy knowledge of "architecture or engineering concepts."  It relied more on setting up tax tables (establishing matrices) with which to do calculations, lists of schools or students, inventories, sales reports, updating lists, etc. that are a part of the everyday functions performed in/by the business world.

Enclosed are some of the papers that depict places where I have applied for business applications programming positions down through the years:  Giant Food, BlueCross BlueShield, I.R.S., etc.  These types of organizations, firms, or agencies had units that took inventory,

performed payroll functions, performed administrative tasks, etc. These were the areas in which I had been trained and for which I had been applying for business positions.

I do not know if there is judicial misconduct in this matter, or just that the presiding judge (in the district court in Baltimore) wanted to ignore supporting documentation in my earlier case because possibly he knew the individuals involved in this matter, but I think it is a huge miscarriage of justice against me. He would not recuse himself from the case, and would not allow me an attorney for guidance or representation. I feel that my civil rights have been, and are still being, violated, and I hope that this court will rectify this injustice against me! I hope it will not ignore the FOIA decision made by Judge Harold Greene, this later FOIA request for documents by another representative with legal credentials which NSA is attempting to ignore, and not allow NSA to continue to blacklist me!

I am making the following requests from the court at this time:

1.    I would like the court to assign a pro bono attorney for the following reasons(s):

16

a.     The plaintiff formerly had an attorney, Charles Q. Pearson, who became disbarred on consent, taking the plaintiff's remaining funds that were to be used in her case and disappearing. He has yet to repay these funds, with interest. I do not know if he was paid to disappear, or to become disbarred on consent by the opposing side.

b.     The plaintiff needs legal counsel for assistance with her case. The plaintiff is not an expert in legal terminology.

2.     I am asking the court to have the agency pay for career destruction, and to have all individuals involved in the incident, directly or indirectly, charged with perjury, fired, and/or imprisoned. They knew I was seeking employment elsewhere, that my programming training/credentials was different and had been informed of this difference, and still chose to intentionally block the plaintiff (see responses in affidavits) from leaving the agency or getting interviews. What NSA has done, and is continuing to do, is in violation of the FOIA, and whistleblower protection law. NSA is trying to place itself above the law, the Congress, and the courts. I have done nothing illegal or wrong to anyone, and I have only tried to protect myself. NSA has tried to continue to steer my career, and if it cannot keep an individual tied

17

down to the agency, it intends to destroy any other opportunities, or goals, an individual wants to make for him or herself.

3.     I am also requesting that NSA not be allowed to say anything about my training in business applications programming since I did not perform this type of work for NSA; only that I worked there under a different programming title that had nothing to do with business applications programming.

4.     I would also like for the court to allow the colleges and/or universities where I took business applications programming to give my references for me for the type of training I received in that area to prospective employers, not the supervisors I reported to the IG in another type of programming for which I never received training in college.

5.     I am also requesting that any hidden documents that have/had caused considerable harm to my job prospects down through the years be removed and destroyed, and that any written and/or oral comments by the supervisors reported in the programming offices be removed since they are retaliatory, and that the systems programming done in those offices report only that I "attempted" a type of programming that

was not the type I had previously taken in college, and that I am not seeking computer systems programming positions.

6.    I am asking the District Court not to transfer this case to Baltimore since that court has allowed NSA to continue to blacklist me and to keep this case as an FOIA and Privacy Act case.

7.    I am asking the court for a jury trial, and for the following damages to cover a 22 to 23-year period of destruction:

(a)    For sexual and/or racial discrimination: $1,000,000;

(b)    For medical or handicap discrimination: $10,000,000;

(c)    For continually blocking prospective job offers (employment discrimination) outside of NSA: $10,000,000;

(d)    Return of funds in the amount of $6,000+ from a disbarred attorney (with interest)  (Attorney Mark Markowitz had ruled in my favor since Charles Pearson did not appear for arbitration);

(e)    For loss of home, IRA's, health insurance, etc.: $10,000,000;

(f)    For maliciously retaliating against me and rebuking Judge Greene's decision/order:  $1,000,000; and,

(g)    If the court finds that NSA was involved in any way (directly or indirectly) for the death of my mother:  $100,000,000; and,

(h)    I am asking the court if it can subpoena my records, and those of my mother, from Delegate Eleanor H. Norton's office.  I do not understand why this office would want to retain them unless they are now going along with the opposing side.

(f)    For maliciously retaliating against me and rebuking Judge Greene's decision/order: $1,000,000; and,

(g)    If the court finds that NSA was involved in any way (directly or indirectly) for the death of my mother: $100,000,000; and,

(h)    I am asking the court if it can subpoena my records, and those of my mother, from Delegate Eleanor H. Norton's office. I do not understand why this office would want to retain them unless they are now going along with the opposing side.

*Margaret S. Tildon*
**Signature**

20

**I. (a) PLAINTIFFS**

Margaret E. Tildon

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** 11001
**(EXCEPT IN U.S. PLAINTIFF CASES)**

Pro se MD

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**

**DEFENDANTS**

Lt. Gen. Keith Alexander

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
**(IN U.S. PLAINTIFF CASES ONLY)**
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Case: 1:08-cv-00346
Assigned To : Collyer, Rosemary M.
Assign. Date : 2/27/2008
Description: Employ. Discrim.

JURY ACTION

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☑ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENSHIP** FOR PLAINTIFF AND ONE BOX FOR DEFENDANT **FOR DIVERSITY CASES ONLY!**

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**☐ A. Antitrust**

- ☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**☐ C. Administrative Agency Review**

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil**

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Immigration
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus- Alien Detainee
- ☐ 465 Other Immigration Actions

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant

- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.

- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not Administrative Agency Review or Privacy Act)

③

| ☐ G. *Habeas Corpus/ 2255* | ☐ H. *Employment Discrimination* | ☐ I. *FOIA/PRIVACY ACT* | ☐ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |
| ☐ K. *Labor/ERISA (non-employment)* | ☐ L. *Other Civil Rights (non-employment)* | ☐ M. *Contract* | ☐ N. *Three-Judge Court* |
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☐ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ Multi district Litigation  ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)
42 USC 2000 (e)

**VII. REQUESTED IN COMPLAINT**  CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $** 20 Million   Check YES only if demanded in complaint **JURY DEMAND** ☐ YES  ☐ NO

**VIII. RELATED CASE(S) IF ANY**  (See instruction) ☐ YES ☐ NO  If yes, please complete related case form.

DATE 2.27.06    SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

   I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

   III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

   IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

   VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

   VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

*UNITED STATES DISTRICT COURT*
*FOR THE DISTRICT OF COLUMBIA*

**MARGARET I. TILDON**

Plaintiff(s),

vs.                                             **Civil Action No.  08-346 (RMC)**

**KEITH B. ALEXANDER**

Defendant(s).

## <u>NOTICE REGARDING BULKY EXHIBITS</u>

Pursuant to the procedures for filing bulky pleadings, bulky exhibits have been filed in paper in

this case.  The exhibits are available at the Clerk's Office for public viewing  and copying

between the  hours of 9:00 a.m. and  4:00 p.m., Monday through Friday.

**NANCY MAYER-WHITTINGTON**

Clerk