UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Margaret I. Tildon, | ) |
| | ) |
| **Plaintiff** | ) |
| | ) |
| v. | ) Civil Action No. 1:08-cv-00346 (RMC) |
| | ) |
| Lt. Gen. Keith B. Alexander, Director | ) |
| Department of Defense, | ) |
| National Security Agency | ) |
| | ) |
| **Defendant** | ) |
| | ) |

## PLAINTIFF'S MOTION NOT TO DISMISS CASE AND NOT TO TRANSFER CASE TO THE FEDERAL COURT IN BALTIMORE

The plaintiff is requesting that this case not be dismissed. Although the plaintiff had submitted dates in her original complaint to the court, she will again submit another motion to supplement the original motion. However, the plaintiff is not an attorney, and had requested help from the pro se division, but was informed that she could not receive help with her complaint at this time. Therefore, I am again forced to try to get the court to see the situation I have encountered.

## I. EVENTS

1,      The plaintiff had been harassed by a co-worker (Kenneth Ramp) in October to November 1985 while working in an area of programming (systems programming, not business applications programming which she had taken in

# RECEIVED

MAY 2 8 2008

1

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

college) in her first programming office, and taking a programming course at the same time for which she was not allowed to test programs and/or was being interfered with while she was working. The incident had been reported to her supervisors (shooting of rubber bands at the plaintiff, one which struck her in her right eye, others hitting her on her shoulders, and reporting of strips that had been placed on her computer screen). One of her supervisors laughed about the incident with the harasser as they both turned toward a wall in the office in which the plaintiff worked. This incident was reported to the internal NSA inspector general's office and an internal EEO representative (Parris Williams) (see enclosed papers).

2.      As a result of the harassment incident, NSA took retaliatory measures against the plaintiff (see Judge Harold Green's ruling and papers that were supposed to have been removed from plaintiff's official personnel folder). Included in this behavior was an informal counseling statement by one of the plaintiff's supervisors in her second programming office which the plaintiff entered in 1988. This supervisor, Celestine Hower, uses remarks by co-workers about the plaintiff's supposedly performance and work ethics, the plaintiff's health condition, etc. Shortly after this counseling statement and other hidden papers were located, Attorney Alan Banov made a request from the federal court in Washington, D.C. to have the papers removed (see documentation) because these papers could be used against the plaintiff to block her from obtaining substantive work elsewhere and were not true. Judge Green ordered that certain ones of these papers be removed from the plaintiff's official personnel folder. Supposedly, these papers were removed. However, after Judge Green made his ruling, the agency continued on its

2

negative path, and another paper was located that was also written by a former co-worker. Several individuals were requested to submit affidavits in search of why the plaintiff was not getting interviews anyplace, and it was subsequently discovered that an affidavit by Richard Jackson and the subsequent "Transcript of Proceedings" were contradictory in nature, in which "word-of-mouth" remarks were being made about the plaintiff's prior programming experience within the agency (particularly COBOL experience), and also about what "probably" would result from her "other type of educational programming experience" if she were to be allowed to go into that area (which had not been used inside of NSA). Richard Jackson, although he did not really know me, construes that I had not had the "appropriate" training for any type of programming. He did not even know that I had done some COBOL programming in the agency (see performance evaluations). If I had not had any type of programming, the agency would not have allowed me into any programming whatsoever. The first programming supervisors, prior to Mr. Jackson making his statements, knew that I was looking for the other type of programming (from the time the policy office stamped my resume and SF-171 in 1986 up to the time I left the agency in 1994), because they were informed of this matter with the policy office and continued to block my efforts in trying to secure interviews outside of this agency. Mr. Jackson was receiving false information from earlier supervisors about my work performance (as indicated in performance evaluations), and thus was spreading this information which he probably did not know was false, or contradictory to the performance evaluations being given. Once the earlier supervisors told others that I had reported them for the harassment

incident, negative documentation began to appear. The plaintiff had not had any problems securing interviews with other agencies until she came to NSA. Then all interviews ceased. The measures were all taken in retaliation for the reporting of the harassment incident in which G75 supervisors and the harasser were reported to authorities. NSA even attempted to "bribe" the plaintiff towards the end of her stay at the agency with a settlement offer (see documentation), but this offer was refused because the individuals who were involved in the "word-of-mouth" comments refused to sign any papers that would have shown they were somehow "linked" to the harassment incident which the agency's attorney said he could/would probably be able to get them to sign. In addition, the agency had already blocked me in for seven years from the time the SF-171 and resume were stamped, killing any chance for the plaintiff to obtain work with her educational training in business applications programming. This again showed that the individuals involved were again going to continue to blacklist me, regardless of what court or judge was making a ruling to stop this behavior. The statements in Mr. Jackson's affidavit and the ones in the Transcript of Proceedings depicts what Mr. Jackson had gathered about the plaintiff's work performance before, during, and after Judge Green's order in 1991. The harassment incident occurred before Judge Green's order, and the affidavits and Transcript of Proceedings followed Judge Green's ruling.

3.      The plaintiff followed the National Security Agency's (NSA) policy when applying for outside programming positions (see stamped SF-171 and resume dated 1986) which were in no way related to tasks that were performed by the plaintiff

while she was working inside of the agency.  The plaintiff sought work in areas that she either held before entering NSA, or that were educationally different and/or taken for business programming purposes (see transcripts).

4.      The plaintiff believes that the court in the District of Columbia does have jurisdiction because when the first case was filed, the plaintiff was living in the District of Columbia, and Judge Green gave his ruling on the case whether the incidents were inside of NSA in Anne Arundel County or not.  The second case also follows along the same line because the plaintiff also now resides in the District of Columbia since she moved back home to take care of elderly parents in 2003 (this case was filed in 2008).  The subject matter again has to do with employment outside of NSA with other federal agencies based on more documents, some of which were inside of NSA, and the agency's refusal to submit any information from the official personnel folder of the plaintiff to the plaintiff's representative or the plaintiff, both who reside in Washington, D.C.  There are documents from the EEO in Washington, D.C. as well as the EEO in Baltimore, and both federal courts (Washington, D.C. and Baltimore).  The plaintiff's official personnel folder, or some hidden folder, also retained a paper written by another co-worker in another office which was not reported by a disbarred attorney (see enclosure).  It demonstrates that these supervisors were taking comments from other workers whom they liked.  Although the harassment incident occurred inside of NSA, the resulting complications have stopped the plaintiff from doing work in any of the areas of employment she held before, or to utilize the educational training she received outside of NSA after leaving the agency that was unrelated to the work she was

performing at NSA. Prior to the harassment incident, the plaintiff had a stellar record with NSA.

5.     The plaintiff is requesting that NSA not be allowed to give remarks/comments about the plaintiff in any manner due to the retaliatory nature of their comments. Only comments from the universities where she obtained educational training substantially different from her work at NSA should be given by her former professors. No comments from any supervisors should be accepted since the plaintiff is not applying for any jobs related to her NSA jobs. The plaintiff attempted prior to the incident to get out of NSA (the plaintiff had applied outside of NSA in 1984, at least a year before the incident).

6.     The plaintiff is asking that this case not be transferred because the last case was subjectively ruled upon by the Baltimore court, supporting evidence was ignored, and the original strip destroyed to cover up evidence of the harassment incident. That is one reason why the plaintiff sent a Xeroxed copy of the strip inside an envelope so that the current court would be able to see that the strip did exist at one time. This was one of the strips that had been placed on the computer screen of the computer the plaintiff had on her desk in her first programming office (G75). NSA did everything in its power to get around this situation, even prolonging time periods when they found it to be advantageous or convenient to their cause (see enclosure).

7.     Supervisors could have stopped this incident before it happened when the plaintiff first asked that it be stopped. However, that did not occur until the plaintiff was struck in the eye by a rubber band. Any cause of action could have

been taken by NSA before or as soon as this incident had been reported to the inspector general. NSA could have informed prospective employers that the plaintiff was seeking work more conducive to her educational background. Instead, when the plaintiff applied for jobs (whether internal or external), the "word-of-mouth" comments were made, as read in the Transcript of Proceedings. NSA had no intention of letting the plaintiff leave or giving any positive comments about her performance since the reporting of the harassment incident, short of the plaintiff resigning. Prior to this incident, the plaintiff was doing very well. She had even received a promotion shortly before this incident occurred in 1985. However, as soon as this incident happened, one supervisor decided to put forth an "informal counseling" statement, and other papers began to appear in the plaintiff's official personnel folder, and elsewhere hidden in the agency. That was one reason Judge Green stepped in.

8.    NSA needs to be punished for damaging/ruining the plaintiff's career (which covers a span of approximately 22 to 24 years, starting with stamped date on a resume and SF-171 in 1986 up to 2006), whether in NSA or elsewhere. This activity needs to be stopped, and the individuals involved reprimanded or held responsible in some manner. The plaintiff should be amply compensated for their negative actions against the plaintiff.

9.    Since my mother (now deceased) had been assisting the plaintiff financially with her case, I do not know if NSA is/has been in any way involved in her demise. The plaintiff's family requested an autopsy report from GWU Hospital, which it

never received. We would like for the court to intervene in this matter. The plaintiff's mother passed in August, 2005.

## II. CONCLUSION

The plaintiff, for the foregoing reasons, requests that this case not be dismissed, or transferred to the federal court in Baltimore, and that NSA be held responsible for allowing this type of behavior against its employees. The plaintiff's efforts, when she was able to work, to secure interviews, were destroyed by the negative retaliatory remarks from NSA supervisors who had been reported to the internal inspector general's office stemming from a 1985 harassment incident.

Respectfully submitted,

Margaret J. Tildon

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2008, I caused the foregoing to

be served, first class mail, postage prepaid, addressed as follows:

Raymond A. Martinez
Special Assistant United States Attorney
Judiciary Center Building
555 Fourth Street, N.W., Civil Division
Washington, D.C. 20530

Margaret I. Tildon
5020 Sheriff Road, N.E.
Washington, D.C. 20019-5539

# TRANSCRIPT
# OF PROCEEDINGS

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

- - - - - - - - - - - - - - - - - - - -x
:
MARGARET I. TILDON,                      :
:
                  Complainant,   :     EEOC No. 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X
v.                         :
:     Agency No. 90-041
VADM JOHN M. McCONNELL, DIRECTOR,        :
NATIONAL SECURITY AGENCY,                :
:
                  Agency.       :
:
- - - - - - - - - - - - - - - - - - - -x

SETTLEMENT STATEMENTS

*All transcripts are not available at this time. The UDC transcript has business courses on it.*

EXHIBIT 2

Fort Meade, Maryland

Tuesday, December 13, 1993

## ACE - FEDERAL REPORTERS, INC.

*Stenotype Reporters*

1120 G Street, NW
Washington, D.C. 20005
(202) 347-3700

**NATIONWIDE COVERAGE**
**800-336-6646**

9200101
marysimons

1

1        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

2                    WASHINGTON FIELD OFFICE

3                  1400 L STREET, N.W., SUITE 200

4                    WASHINGTON, D.C. 20005

5    - - - - - - - - - - - - - - - - X

6    MARGARET I. TILDON,                   :

7              Complainant,               :

8    v.                                    :   EEOC No. 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X

9    VADM JOHN M. McCONNELL, DIRECTOR, :  Agency No. 90-041

10   NATIONAL SECURITY AGENCY,             :

11              Agency.                    :

12   - - - - - - - - - - - - - - - - X

13                              Department of Defense

14                              National Security Agency

15                              9800 Savage Road

16                              Fort Meade, Maryland 20755-6000

17                              Tuesday, December 13, 1993

18        The settlement statements in the above-entitled

19   matter convened at 12:21 o'clock p.m. in Room 2B8156,

20   OPS-2B of the National Security Agency:

21   BEFORE:

22        ERIN E. POWELL, Administrative Judge

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700        800-336-6646        410-684-2550

19200101
marysimons

2

```
1     APPEARANCES:

2          On Behalf of the Agency:

3               LARRY W. PRICE, ESQ.

4               SUSAN A. ARNOLD, ESQ.

5               Office of General Counsel

6               National Security Agency

7               9800 Savage Road

8               Fort Meade, Maryland 20755-6000

9

10         On Behalf of the Complainant:

11              CHARLES QUENTIN PEARSON, ESQ.

12              ALUANDA R. DRAIN, Associate

13              1919 Pennsylvania, N.W.

14              Suite 300

15              Washington, D.C. 20006

16              (202) 736-2146

17

18    ALSO PRESENT:

19              RONA LERNER, Office of Policy

20              SHIRL T. CREEK, EEO Office

21              MARGARET I. TILDON, Complainant

22                         - - -
```

9200101
marysimons

3

P R O C E E D I N G S

JUDGE POWELL:  My name is Erin Powell.  I'm

Administrative Judge assigned by the United States Equal

Employment Opportunity Commission to the case of Margaret

Tildon versus the National Security Agency, EEOC Case No.

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X and Agency Case No. 90-041.

We convened today, December 14th, 1993 to hold a

hearing in this matter.  The parties have agreed to settle

in principle.

At this time I would like Ms. Tildon's

Representative, Charles Pearson, to read into the record the

principle agreement, and then I'm going to ask the Agency

Representative, Larry Price, to concur that he has agreed in

principle, pending certain contingencies which he will

explain.

Mr. Pearson.

MR. PEARSON:  The settlement that we have reached

in principle involves the following matters:

No. 1, a memorandum will be drafted to the file,

specifically Ms. Tildon's personnel file, indicating that

she in fact has served as a computer programmer under

previous supervisors, and there will be certain language in

9200101
marysimons

4

1    that memorandum indicating that she programmed in several

2    programming languages, COBOL and C programming languages

3    specifically, and that she received satisfactory and

4    excellent evaluations while working under that group.

5         The second item that will be included as part of

6    this settlement is an affidavit from Richard Jackson, who

7    retracts earlier statements that went to Ms. Tildon lacking

8    certain experience with regard to COBOL programming, when in

9    fact she did have that experience in COBOL programming.

10        The third matter that's similar to the first two

11   is that Ms. Tildon will have the opportunity to review her

12   personnel file to make sure there is nothing in there

13   causing an obstacle to her ability to seek employment either

14   within or without the Agency.

15        And the final item is there will be a monetary

16   lump sum payment from the Agency to Ms. Tildon in the amount

17   of $5,000.

18        This is an undisclosed settlement and it also

19   will admit to no wrongdoing on the part of the Agency.

20        JUDGE POWELL:  Mr. Price, do you agree that those

21   are the principle terms of the settlement?

22        MR. PRICE:  Yes.

9200101
marysimons

5

1          JUDGE POWELL:  We have said that it's a

2     settlement in principle, and I would just like you to

3     explain what you're going to do after we get off the record

4     and the people you're going to check with.

5          MR. PRICE:  I have two statements that have been

6     prepared by Mr. Pearson, one to be signed by B. Daft and the

7     other by W. Stroh.  As I stated, I have not been able to

8     contact either of these individuals, but I am fairly

9     confident that they would be willing to sign those

10    statements.

11          I did talk to Richard Jackson, and I have a copy

12    of the proposed statement from Richard Jackson.  From my

13    conversation with him, I'm likewise confident that he will

14    sign that affidavit to go into the EEO hearing file.

15          As far as the terms of the settlement, the

16    agreement would also state:

17          That the agreement settles and resolves all

18    claims against the Agency, including its officers and

19    employees and the United States for the discrimination that

20    is set forth in the charge in the complaint;

21          That, as Mr. Person indicated, this settlement is

22    for the convenience of the parties and it does not

19200101
.marysimons

6

1    constitute an admission by the Agency or its employees that

2    they engaged in discrimination against the Complainant as

3    alleged in the charge;

4         That the Complainant in the settlement waives and

5    abandons any and all claims that she has against the Agency

6    that arise from or relate to the allegations of

7    discrimination that are set forth in the charge and

8    complaint;

9         That there have been no other promises or

10   inducements made or offered as an inducement, except as set

11   forth in the agreement;

12        That, as Mr. Pearson indicated, the agreement

13   shall not be publicized or divulged by either party, their

14   agents or representatives in any manner except as necessary

15   for the Agency to administer the agreement and except to the

16   extent necessary for Ms. Tildon to resolve any tax or legal

17   obligations with federal, state and local agencies and

18   courts;

19        That the terms of the agreement will not

20   establish any precedent, nor will be the agreement be used

21   by the Complainant to seek or justify similar terms in a

22   subsequent case, and;

39200101
marysimons

7

1        That the execution of the agreement by Ms. Tildon

2   and by the Agency official would constitute dismissal of the

3   action with prejudice and also the monetary sum of $5,000,

4   that's a lump sum payment and that includes attorneys fees,

5   costs and everything.  That's $5,000 to cover everything.

6        JUDGE POWELL:  Do the parties agree that that is

7   actually the settlement in principle?

8        MR. PEARSON:  In principle, yes, that's correct.

9        JUDGE POWELL:  And, Mr. Price, you've agreed with

10  everything set forward?

11       MR. PRICE:  Yes.

12       JUDGE POWELL:  Based on the parties' agreement, I

13  am going to say that this case is settled.

14       I will wait for the final papers.  I do need a

15  copy from, I guess, Mr. Price, it would be your

16  responsibility, once everything is signed, to either fax it

17  or mail it or courier it to me.

18       But based on both parties' representations we

19  will not hold the hearing today.

20       Thank you.

21       (The settlement statements in the above-entitled

22  matter concluded at 12:25 o'clock p.m.)lock p.m.)

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700        800-336-6646        410-684-2550

UNITED STATES GOVE  NT

## memorandum

DATE: 3 April 1990

REPLY TO
ATTN OF: Senior Medical Advisor

SUBJECT: Request for Medical Evaluation – TILDON, Margaret
SSN: 577 66 5690 – INFORMATION MEMORANDUM

TO: ▓▓▓▓▓

    Ms. Margaret Tildon was medically evaluated on 26 March 1990 by ▓▓▓▓▓▓▓▓▓▓▓▓, M.D. and was found to be in good health except for obesity. She is three years post surgery for a hysterectomy and other than treatment for allergies should be fully recovered. No reason ws found which would prohibit her from performing all her assigned duties. Her handicap code and physical restrictions have therefore been removed. She has not been psychologically evaluated.

                              ▓▓▓▓▓▓▓▓▓▓ M.D.
           Senior Medical Advisor

MEDICAL/PSYCHOLOG.    INFORMATION REQUIRED

TO RESPOND TO MEDICAL EVALUATION REQUESTS

~~ease~~ provide brief and to-the-point information under each of the ~~headings~~ to assist the Senior Medical Advisor in ~~responding~~ to the ▮▮▮and a request for medical evaluation.  The completed form and the medical/psychological record should be sent to Chief ▮▮ to forward to Senior Medical Advisor.

1.  Brief history of the medical/psychological condition.
    *1. History of hysterectomy (1987) for ovarian cyst & endometriosis*
    *2. History of allergies being treated.*
    *3. History of thyroid condition.*

2.  Clinical findings from the most recent evaluation.
    *# 1. Obesity*
    *2. P.O. scars - abdomen - and midline*
    *3. Small umbilical hernia - asymptomatic.*

3.  Diagnosis
    *# 1. Obesity*
    *2. Post-operative hysterectomy - 3 yrs.*
    *3. Small umbilical hernia - asymptomatic*

4.  Prognosis, including plans for future treatment and an estimate of the expected date of full or partial recovery.
    *Full recovery except for allergies should be at the present time.*

5.  An explanation of the impact of the condition on overall activities both on and off the job.
    *Should be able to do full duty without any restrictions. See no need for her handicap coding.*

6. An explanation of the medical/psychological basis for conclusion. *Has not had a psychological interview. States it has been cancelled.*

7. Narrative explanation of the basis for any conclusion. *My feeling this patient is playing the system. 3 yrs post hysterectomy should be well and doing everything.*

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓  *SmD*

**Signature/Title**

*26 March '90*

**Date**

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# District of Columbia Court of Appeals

No. 95-BG-907

In the Matter of
CHARLES Q. PEARSON, ESQUIRE
A Member of the Bar of the
District of Columbia
Court of Appeals

**FILED**

**AUG 1 8 1995**

CLERK, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

BDN: 42-95, et al.

BEFORE: King and Ruiz, Associate Judges; and Belson, Senior Judge.

## O R D E R

### (FILED August 17, 1995)

On consideration of the affidavit of Charles Q. Pearson, wherein he consents to disbarment from the Bar of the District of Columbia pursuant to § 12 of Rule XI of the Rules Governing the Bar of the District of Columbia, which affidavit has been filed with the Clerk of this Court, and the report and recommendation of the Board on Professional Responsibility with respect thereto, it is this 17th day of August, 1995

ORDERED that the said Charles Q. Pearson, is hereby disbarred on consent.

The Clerk shall publish this order, but the affidavit shall not be publicly disclosed or otherwise made available except upon order of the Court or upon written consent of the respondent.

The Clerk shall cause a copy of this order to be transmitted to the Chairman of the Board on Professional Responsibility and to the respondent, thereby giving him notice of the pro-

[1835]

EXHIBIT 8

2

visions of Rule XI, § 14 and 16, which sets forth certain rights
and responsibilities of disbarred attorneys.

PER CURIAM

A true copy.
Test:

Clerk ... Columbia Court
of Appeals.

DEPUTY CLERK

Charles Quentin Fraser
AHy ID 419038
Active - 004 11/6/89
1919 Pennsylvania NW
Suite 2000
Wash, DC 20006
[1836]        202-736-2146

# IN THE D.C. SUPERIOR COURT
# FOR THE DISTRICT OF COLUMBIA

Margaret I. Tildon,          )
     Plaintiff          )
                   )
        v.           )     Civil Action No.
                   )
Charles Q. Pearson,       )
     Defendant        )
2151 N. Anvil Lane      )
Temple Hills, MD 20748-4273 )

## COMPLAINT

1. Plaintiff resides at 1014 Barnsbury Court, Capitol Heights, MD 20743-4214.

2. Defendant resides at 2151 N. Anvil Lane, Temple Hills, MD 20748-4273.

3. The plaintiff seeks to collect unused court fees from disbarred attorney. This action is being taken because:

    a. The former attorney did not inform plaintiff that he was disbarred, and when he was confronted with this information, he denied he had been disbarred. Plaintiff has a copy of disbarment which was sent from the federal court.

    b. The disbarred attorney did not return phone calls.

    c. Charles Q. Pearson stopped sending monthly statements of money paid and money spent out, and did not leave a forwarding address or phone number where he could be reached.

    d. Because of his disbarment, Charles Pearson was not able to continue with plaintiff's case in federal court and money had previously been paid for court representation to him. That portion of fees paid to him has not been refunded to plaintiff.

## CERTIFICATE OF SERVICE

I certify that the foregoing Complaint was served on August 29, 1997 on the following:

Charles Q. Pearson at 2151 N. Anvil Lane, Temple Hills, MD 20748-4273.

*Margaret I. Tildon*

Margaret I. Tildon
1014 Barnsbury Court
Capitol Heights, MD 20743-4214
(301) 735-6757

EXHIBIT 13

This inside envilope that was found mailed on my computer screen.



EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

WASHINGTON FIELD OFFICE

1400 L. STREET, NORTH WEST, SUITE 200

WASHINGTON, D. C. 20005

————————————————————— X

MARGARET I. TILDON,                           :

    COMPLAINANT,                          :

                             :

VS.                                           :   EEOC NUMBER 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 X

                             :   AGENCY NUMBER 90-041

VADM, JOHN MCCONNELL, DIRECTOR,    :

NATIONAL SECURITY AGENCY.                      :

————————————————————— X


MONDAY, NOVEMBER 29, 1993

FORT MEADE, MARYLAND 20785

THE DEPOSITION OF RICHARD JACKSON, WITNESS, WAS CALLED

FOR EXAMINATION BY COUNSEL FOR THE COMPLAINANT, PURSUANT TO

NOTICE, AT THE OFFICE OF LARRY W. PRICE, ESQ., AGENCY

REPRESENTATIVE, NATIONAL SECURITY AGENCY, OFFICE OF THE GENERAL

COUNSEL, 9800 SAVAGE ROAD, FORT MEADE, MARYLAND 20785, BEFORE

SHARON L. BANKS, A NOTARY PUBLIC IN AND FOR THE STATE

OF MARYLAND, BEGINNING AT 2:40  O'CLOCK A.M., WHEN WERE

PRESENT ON BEHALF OF THE RESPECTIVE PARTIES:



**SHARON L. BANKS REPORTING**

COURT REPORTERS

P.O. BOX 44773

FORT WASHINGTON, MARYLAND 20744

A P P E A R A N C E S

FOR THE COMPLAINANT:

CHARLES Q. PEARSON, ESQ., AND ALUANDA DRAIN, ESQ.,
1919 PENNSYLVANIA AVENUE, NORTH WEST, SUITE 300, WASHINGTON,
D. C. 20006


FOR THE NATIONAL SECURITY AGENCY:

LARRY W. PRICE, ESQ., AGENCY REPRESENTATIVE, OFFICE OF THE
GENERAL COUNSEL, 9800 SAVAGE ROAD, FORT MEADE, MARYLAND 20785



I N D E X

WITNESS                MR. PEARSON              MR. PRICE

   RICHARD JACKSON        4/22                    22

E X H I B I T S

(NONE MARKED)



4

# P R O C E E D I N G S

1   WHEREUPON,

2   

3   RICHARD L. JACKSON,

4   WAS CALLED AS A WITNESS BY AND ON BEHALF OF THE COMPLAINANT

5   AND AFTER HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND

6   TESTIFIED AS FOLLOWS:

7   DIRECT EXAMINATION

8   BY MR. PEARSON:

9   Q    GOOD AFTERNOON, MR. JACKSON.

10  A    HI.

11  Q    WOULD YOU STATE YOUR FULL NAME FOR THE RECORD,

12  PLEASE?

13  A    RICHARD L. JACKSON.

14  Q    CAN YOU TELL US WHAT YOU DO HERE AT NSA?

15  A    I AM THE DEPUTY DIVISION CHIEF OF THE N 36.

16  Q    HOW LONG HAVE YOU BEEN IN THAT POSITION?

17  A    SINCE WE HAVE HAD REORGANIZATIONS.  SO,

18  WHY DON'T I JUST SAY DECEMBER 6, 1992.

19  Q    CAN YOU JUST TELL ME SOME OF YOUR EDUCATIONAL

20  BACKGROUND?

21  A    I HAVE A BACHELORS DEGREE IN ACCOUNTING.

22  Q    DO YOU WORK WITH COMPUTER SYSTEMS IN YOUR

23  CAPACITY HERE AT NSA?



1      A       WE DO BUSINESS, CORPORATE PROGRAMMING WITHIN
2   MY DUTIES, YES.

3      Q       DO YOU PROGRAM?  ARE YOU A PROGRAMMER?

4      A       NO.  I AM A MANAGER.

5      Q       HAVE YOU EVER BEEN A PROGRAMMER?

6      A       YES.

7      Q       WHAT LANGUAGES DO YOU PROGRAM?

8      A       DON'T LAUGH, BUT THEY ARE ASSEMBLY  AND SOME
9   TILE LANGUAGE, WHICH IS A HIGHER LEVEL.  I DID.  IT HAS
10  BEEN A WHILE.

11     Q       WHY WOULD I LAUGH AT ASSEMBLY.  I WISH I
12  COULD HAVE PROGRAMMED ASSEMBLY.

13     A       IT HAS BEEN A LONG TIME.  PEOPLE, YOU KNOW,
14  THOSE DAYS ARE GONE.  TODAYS PROGRAMMERS USE THE HIGH LEVEL
15  STRUCTURE.

16     Q       AT SOME POINT, YOU CAME TO KNOW MS. TILDON;
17  IS THAT CORRECT?

18     A       THAT IS RIGHT.

19     Q       HOW DID THAT HAPPEN?

20     A       AUGUST '91, I SAW MARGARET TILDON'S PER SUM
21  AND SHE HAD BEEN, I THINK SHE HAD BEEN INTERVIEWED BY
22  SOMEONE IN MY OFFICE AND I KNOW THAT SHE WAS NOT GOING TO
23  BE SELECTED.  WHEN I SAW HER CREDENTIALS, AND I SAW THE



1   SCHOOLS THAT SHE HAD GONE TO, I FELT LIKE I WANTED TO

2   SEE IF I COULD HELP HER BECAUSE I FELT BECAUSE I SAW SHE

3   WAS A MINORITY, AND I WANTED TO HELP IF I COULD. SO, I

4   WANTED TO GET TO KNOW HER AND I GAVE HER A CALL.

5          Q      WHAT POSITION DID SHE APPLY FOR?

6          A      I BELIEVE IT WAS A PAYROLL POSITION.

7   IT WAS IN OUR PAYROLL DIVISION, PAYROLL BRANCH.

8          Q      WHAT, IN HER PER SUM, TO YOU, INDICATED THAT

9   SHE WAS NOT QUALIFIED?

10         A      I DID NOT MAKE THE DECISION. I SAW HER

11  PER SUM AND I WANTED TO HELP HER BECAUSE I SAW SHE WAS

12  A MINORITY.

13         Q      BUT YOU KNEW SHE WAS NOT GOING TO GET

14  HIRED.

15         A      YES. I HAD NOTHING TO DO WITH THE SELECTION

16  PROCESS.

17         Q      WHO TOLD YOU SHE WAS NOT GOING TO GET HIRED?

18         A      I REALLY DON'T REMEMBER WHICH ONE IT WAS.

19  YOU KNOW, IT WAS NOT A MATTER OF THEM TELLING ME THAT SHE

20  WAS NOT GOING TO BE HIRED. IT IS JUST THAT SHE WAS NOT

21  THE ONE THAT WAS SELECTED. SO, THEY DON'T GO WELL, THIS

22  ONE IS NOT GOING TO BE HIRED. THEY SELECT SOMEBODY ELSE.

23  SO, IT IS NOT A MATTER OF SAYING THIS ONE IS NOT GOING



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372-6922

1   TO BE HIRED, THIS ONE IS GOING TO BE HIRED.  THAT WAS

2   A PRETTY TOUGH POSITION. SO, THEY WERE REALLY, I THINK

3   THEY WERE BEING SELECTIVE.

4          Q        EXACTLY, WHAT WAS THE POSITION?

5          A        JUST WHAT I SAID, COMPUTER PROGRAMMER.

6          Q        TO DO WHAT?

7          A        PROGRAM.

8          Q        IN WHAT LANGUAGE?

9          A        YOU HAD TO DO SOME DATA BASE STUFF.   I

10  THINK SOME 204, MAYBE SOME COBOL AND SOME FOCUS, I BELIEVE.

11  I AM NOT SURE.  I WAS NOT REALLY TAKING PART IN THAT

12  PARTICULAR THING.

13         Q        WHAT WAS IT IN MS. TILDON'S PER SUM THAT IN YOUR

14  MIND, SAID SHE WAS NOT QUALIFIED?

15         A        I HAD NOTHING TO DO WITH THAT.  WHAT MS.

16  TILDON HAD, AS FAR AS I WAS CONCERNED WAS SHE WAS A MINORITY

17  THAT I WANTED TO REACH OUT AND HELP IF I COULD.

18         Q        BEAR WITH ME BECAUSE I AM KIND OF CONFUSED.

19         A        DON'T BE.

20         Q        SHE HAD COBOL PROGRAMMING EXPERIENCE.

21         A        I HAVE NOTHING TO DO WITH HER EXPERIENCE.

22  ALL I SAW WAS SHE WAS  A MINORITY AND I WANTED TO REACH

23  OUT AND HELP HER.  THAT IS ALL.  NOTHING MORE.



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P O BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372 6922

1    Q    LET ME READ FROM YOUR AFFIDAVIT THAT YOU

2    FILED IN THIS CASE. DO YOU RECALL THAT AFFIDAVIT?

3    A    YES.

4    Q    "I DETERMINE FROM MS. TILDON'S PERSONNEL

5    SUMMARY THAT SHD HAD LITTLE OR NO KNOWLEDGE CONCERNING

6    SOFTWARE ENGINEERING AND DID NOT HAVE A GOOD UNDERSTANDING

7    OF PROGRAMMING IN GENERAL.

8    A    OKAY.

9    Q    HOW DID YOU MAKE THAT DETERMINATION? WHAT

10   WAS IT IN HER PER SUM THAT LEAD YOU TO THAT CONCLUSION?

11   A    JUST WHAT SHE HAD, NOTHING. NO DESIGN,

12   NO SOFTWARE REQUIREMENTS. THEN WHEN I TALKED TO HER, SHE

13   KNEW NOTHING ABOUT THIS KIND OF THING. SO, I FOUND OUT

14   MORE AND I KNEW THAT SHE REALLY NEEDED HELP. AND IF I

15   COULD GIVE HER THIS ADVICE, I WAS GOING TO DO THAT.

16   STRICTLY ASSISTANCE; NOTHING MORE.

17   Q    SO, THEN IN YOUR OPINION, HER  MORE THAN

18   400 HOURS OF COMPUTER CLASSES - -

19   A    SHE DID NOT HAVE 400 HOURS COMPUTER CLASSES.

20   Q    MAY I HAVE THE PER SUM, PLEASE. I WANT TO

21   SHOW YOU WHAT HAS BEEN MARKED AS EXHIBIT NUMBER  26.

22   A    THIS COBOL PROGRAM, 160 HOURS.

23   WHEN YOU PUT SOMETHING LIKE THAT DOWN THERE,



FORM 2

1    THAT IS COMPLETELY MISLEADING BECAUSE THERE IS NO WAY THAT

2    THE NCS COURSE - - THEY MAY PUT 160 HOURS AS FAR AS TIME

3    AND ALL GO.  THAT IS NOT CREDIT.  SO, THERE IS NO WAY

4    THAT YOU CAN TELL ME THAT ANYBODY HAS 400.  I MEAN SHE

5    WOULD HAVE A DOCTORATE IF SHE HAD 400 HOURS.  SHE DOES

6    NOT HAVE 400 HOURS OF COMPUTER PROGRAMMING.  THAT DOES NOT

7    MEAN 160 HOURS.  WHAT THAT IS IS JUST LIKE A COLLEGE

8    COURSE.  IT MAY BE TWO SEMESTER HOURS, AT BEST.  YOU

9    CAN NOT SAY THAT IS 160 HOURS.  IT IS NOT.

10                Q        OKAY.  NOW, DID YOU SEE THIS PER SUM BEFORE

11    TODAY?

12                A        NOT THAT ONE, NO.

13                THE WITNESS:  MARGARET, WHAT YOU HAVE TO DO

14    IS GET THIS - -

15                MR. PEARSON:  DON'T SAY ANYTHING.

16                BY MR. PEARSON:

17                Q        I AM HANDING YOU WHAT HAS BEEN MARKED AS

18    EXHIBIT 28.

19                A        WHAT GRADE DID SHE GET ON THIS?

20                Q        IS THAT THE PERSONNEL SUMMARY THAT YOU ACTUALLY

21    SAW?

22                A        NO, I - - IT CERTAINLY DOES NOT LOOK LIKE IT.

23    CERTAINLY NOT THIS.



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372 6922

10

1    Q       THE PERSONNEL SUMMARY THAT YOU DID REVIEW

2   FOR MS. TILDON, DID IT INCLUDE THE 160 HOURS OF COBOL?

3    A       I WOULD NOT BUY IT.   LIKE I AM TELLING YOU

4   NOW,  I KNOW ABOUT THE NCS COURSE.

5    Q       I UNDERSTAND THAT  - -

6    A       I KNOW IT IS NOT 160  HOURS.

7    Q       I UNDERSTAND.

8    A       YOU DON'T GET 160 HOURS FOR ANY COURSE.

9    Q       I UNDERSTAND THAT YOU ARE QUESTIONING

10   THE 160 HOURS.

11   A       YEAH.  CAUSE YOU ARE TELLING ME 400

12   HOURS AND, YOU KNOW, I  DON'T BUY THAT.

13   Q       WELL, WE CAN SIT HERE ALL DAY GOING BACK

14   AND FORTH.  THE QUESTION IS REAL SIMPLE.

15   WHEN YOU REVIEWED  THE DOCUMENT, DID IT HAVE 160 HOURS

16   ON IT?

17   A       NO.  I MEAN I DON'T KNOW.  BUT EVEN IT IF

18   DID, I WOULD NOT BELIEVE THAT.  I DON'T BUY THAT.  I AM

19   TELLING YOU STRAIGHT OUT.  I DON'T KNOW HOW MUCH PLAINER

20   I CAN MAKE IT.  THAT IS NOT TRUE.

21   Q       OKAY.

22   A       IT IS NOT CREDIT HOURS.

23   Q       WELL, IF YOU ELIMINATE THE OTHER, THE 160



**SHARON L. BANKS REPORTING**

COURT REPORTERS

P.O. BOX 44773

FORT WASHINGTON, MARYLAND 20744

(301) 372-8922

1  HOURS FOR WHAT EVER REASON, WHAT ABOUT THE BALANCE OF WHAT

2  APPEARS ON THERE?

3         A        WHAT MARGARET HAD, YOU KNOW, SHE DID NOT HAVE

4  THE BACKGROUND. I REALLY DETERMINED THAT A LOT AFTER I

5  TALKED TO HER AS WELL. BECAUSE THIS DEPOSITION WAS TAKEN

6  AT THE END, AFTER I HAD FINISHED WITH MARGARET. YOU KNOW

7  WHETHER OR NOT  YOU KNOW, AS FAR AS THE SEQUENCE OF

8  EVENTS, I WAS TRYING TO HELP MARGARET AND HERE I AM NOW,

9  I DON'T KNOW WHETHER I AM DEFENDING MYSELF OR WHAT, BUT

10 MY ONLY POSITION WAS TO TRY TO HELP HER AND GIVE HER SOME

11 GUIDEANCE AND WHEN I TALKED TO HER, I FOUND OUT SHE HAD

12 NOTHING IN DESIGN. SHE KNEW NOTHING ABOUT REALLY LOGIC FOR

13 COMPUTERS. AND SO I ENCOURAGED HER TO TAKE SOME COURSES

14 AND I TALKED TO HER ON SEVERAL OCCASIONS. SHE TOLD ME

15 AT ONE TIME, HER SUPERVISOR WOULD NOT ALLOW HER TO TAKE

16 IT BECAUSE THIS COURSE WAS NOT IN HER, I GUESS, COSC AND

17 I SAID LOOK IF THAT SUPERVISOR GIVES YOU THAT KIND OF

18 FEEDBACK, YOU HAVE THEM CALL ME BECAUSE THAT IS NOT TRUE

19 AND I HAD HER TAKE PL 1 AND OR JUST SOME OTHER COURSES

20 BECAUSE HER  BACKGROUND TO ME, WAS WEAK IN DESIGN AFTER

21 TALKING TO HER. SHE REALLY DID NOT KNOW PROGRAMMING AS FAR

22 AS WHAT I COULD SEE, YOU KNOW AND AS FAR AS BEING AN

23 ANALYST GOES AND I WANTED HER TO STRENGTHEN HERSELF. SHE



12

SAID THAT SHE WAS INTERESTED IN  - -

Q    WELL, LET ME ASK YOU A QUESTION.

A    SURE.

Q    YOU ARE SAYING HER BACKGROUND WAS INSUFFICIENT AND YOU MENTIONED THE INSTITUTIONS THAT SHE ATTENDED LEAD YOU TO WANT TO HELP HER, IS THAT CORRECT?

A    RIGHT.  THAT IS TRUE.

Q    SHE ATTENDED THE UNIVERSITY OF THE DISTRICT OF COLUMBIA.

A    RIGHT.

Q    WHY DID THAT RAISE A SIGNAL IN YOUR HEAD?

A    BECAUSE I KNEW SHE WAS A MINORITY.

Q    WHAT YOU SAID WAS BECAUSE OF THE INSTITUTIONS SHE ATTENDED.

A    NO, NO.  I KNEW SHE WAS A MINORITY.  SURE.

Q    OH, BASED ON THE INSTITUTION THAT SHE ATTENDED, YOU KNEW SHE WAS A MINORITY?

A    I ASSUMED SHE WAS A MINORITY.  SO, I CALLED TO FIND OUT AND THAT IS WHAT I WANTED TO KNOW.  I WANTED TO HELP HER IF I COULD.

Q    HOW DID YOU GET TO SEE HER PERSONNEL SUMMARY, AGAIN?

A    I DID NOT SAY.  I DON'T REMEMBER IT, BUT IT



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372-6922

1  CAME ACROSS MY DESK THE FACT THAT SHE WAS ONE OF THE

2  APPLICANTS AND I THINK IT COULD HAVE BEEN - -

3      Q     IF YOU ARE NOT INVOLVED IN - -

4      A     WAIT A MINUTE. WAIT A MINUTE. IT COULD

5  HAVE BEEN WITH EO CIRCULATING HER PER SUM BECAUSE SHE WAS

6  LOOKING FOR A JOB. ONE OF THOSE.

7      Q     IF YOU ARE NOT INVOLVED IN THE PROCESS, WHY

8  WOULD THIS COME ACROSS YOUR DESK?

9      A     I AM THE DEPUTY CHIEF OF THAT PARTICULAR

10  ORGANIZATION. AND SO, I DON'T MAKE THE FINAL DECISIONS,

11  THE DIVISION CHIEF DOES.

12      Q     DO YOU HAVE ANY INPUT IN THE DECISION?

13      A     SOMETIMES, YES. DEPENDS ON WHETHER THEY COME

14  TO - - IF WE ACTUALLY DO THE INTERVIEW. I THIS PARTICULAR

15  CASE, WE DID NOT DO THE INTERVIEW IN THE OFFICE. IT WAS

16  DONE BY, I THINK, OUT IN THE BRANCH. BUT ALSO - -

17      Q     WELL, LET ME ASK YOU THIS:

18      A     LET ME - - WAIT A MINUTE. IT SEEMS TO ME LIKE

19  MARGARET'S PER SUM CAME AS A RESULT OF HER GOING TO EEO

20  AND BEVERLY GAVE, GAITHER SENDING OUT HER PER SUM TO EVERYBODY

21  SEEING IF THEY WANTED TO HELP HER.

22      Q     OKAY.

23      A     THAT IS HOW.



**SHARON L. BANKS REPORTING**

COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372 6922

1    Q    WHEN YOU SAW  IT COME ACROSS YOUR DESK,
2  YOU SAW  U.D.C. ON HERE AND YOU SEE IT COMING FROM EEO - -
3    A    AND HOWARD AND YOU KNOW.
4    Q    SHE IS BLACK - -
5    A    OF COURSE I WANTED TO HELP HER.
6    Q    BECAUSE WHITE PEOPLE DON'T GO TO THE UNIVERSITY
7  OF THE DISTRICT OF COLUMBIA.
8    A    YOU ARE STRETCHING SOMETHING THAT I AM NOT
9  SAYING.
10    Q    I AM ASKING THE QUESTION.
11    A    LET ME TELL YOU SOMETHING AND GET IT STRAIGHT
12  RIGHT NOW.  I CALLED HER TO MAKE SURE.  NOW, IF SHE WAS
13  NOT BLACK, THEN YOU KNOW, THERE WAS NOTHING I COULD DO.
14  BUT THE FACT SHE WAS BLACK I FELT LIKE I COULD HELP HER.
15  AT LEAST TRY.
16    Q    DO YOU KNOW BILL STROH?
17    A    NOPE.
18    Q    HOW ABOUT BERNIE STAFF?
19    A    NOPE.
20    Q    WHAT ABOUT GERALD MATTHEWS?
21    A    NO.
22    Q    LESTER WHITE?
23    A    NO.  WHO ARE THESE PEOPLE?  IS THIS SOMEBODY



1    I AM SUPPOSED TO KNOW?

2    Q    I WILL ASK THE QUESTIONS.

3    A    WELL, LOOK, I AM NOT ON TRIAL. I AM GOING TO

4    ASK YOU IF I DON'T UNDERSTAND WHY YOU ARE ASKING SOMETHING

5    HERE. LETS HAVE A COOPERATIVE EFFORT HERE.

6    Q    HAVE YOU EVER TALKED TO ANYONE ABOUT MS.

7    TILDON?

8    A    YES.

9    Q    WHO?

10   A    I TALKED TO JIM ROSS. I TALKED TO WILLIAM

11   RICH ABOUT HER.

12   Q    WHO IS JIM ROSS?

13   A    A FRIEND OF MINE.

14   Q    IN THE AGENCY?

15   A    YES. HE IS STILL HERE.

16   Q    WHY DID YOU TALK TO HIM?

17   A    WELL, BECAUSE I WANTED TO SEE IF WE COULD HAVE

18   A NETWORK; SEE IF WE COULD POSSIBLY HELP MARGARET GET A

19   JOB SOME PLACE BECAUSE WE FELT LIKE YOU KNOW, AS BLACK

20   PEOPLE, AND WE HAVE BEEN HERE A LONG TIME. IF WE COULD HELP

21   SOMEBODY, THEN WE ARE GOING TO TRY TO DO IT. THAT IF WE

22   CAN HELP HER GET A JOB SOME PLACE ELSE OR GIVE HER SOME

23   ADVICE. I MEAN SHE IS NOT THE FIRST PERSON WE HAVE DONE



16

1  THIS FOR.  THERE HAVE BEEN OTHERS THAT WE TRY TO HELP, TRY

2  TO GIVE SOME CAREER ADVICE.

3        Q        DO YOU RECALL, IN YOUR AFFIDAVIT, A STATEMENT

4  THAT YOU QUOTED MR. WISEMAN AS SAYING MS. TILDON HAD NO

5  COBOL EXPERIENCE IN SCHOOL?

6        A        IF THAT IS WHAT I SAID BACK THEN.

7        Q        WELL, SIR, I JUST WANT TO REMIND YOU YOU

8  ARE UNDER OATH. SO, WE HAVE TO GET IT RIGHT.  IN THIS

9  STATEMENT YOU SAID MR. WISEMAN STATED THAT MS. TILDON HAD

10  NO COBOL COMPUTER PROGRAMMING TRAINING SINCE SHE WAS IN

11  SCHOOL AND THAT WAS NOT ENOUGH TO MAKE HER QUALIFIED FOR

12  THE CHALLENGING POSITION THAT WAS OPEN IN THE PAYROLL

13  AREA  WITHIN THE DIVISION.

14        A        LOOK, YOU KNOW, IF I SAID THAT AND YOU

15  ARE SAYING IN THAT POSITION, I DID, THAT IS NOT A QUOTE

16  FROM GENE WISEMAN.  I MEAN THAT IS JUST MY - -THAT'S MY

17  INTERPRETATION AND THERE IS NO WAY THAT YOU SHOULD HOLD

18  THAT AS SOMETHING THAT GENE WISEMAN SAID VERBATIM.

19    NOW, IF I SAID THAT, THAT IS FINE.  I AM NOT GOING

20  TO DENY THAT BECAUSE I KNOW IT WAS SOMETHING LIKE THAT.

21  I DON'T REMEMBER THE EXACT WORDS, BUT MY ONLY THING ABOUT

22  MARGARET WAS TO HELP HER.

23        Q        OKAY.  BUT - - MAYBE YOU PARAPHRASED MR.



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372-6922

WISEMAN.  BUT YOU SEEMED TO BE VERY CLEAR THAT MS. TILDON
HAD NO COBOL COMPUTER PROGRAMMING SINCE SHE WAS IN SCHOOL,
I GUESS UDC.

      A      I WOULD SAY THAT.  THAT IS CORRECT, YES.

      Q      BUT YOU JUST READ HER PER SUM THAT SAID SHE
HAD SOMETHING AT NSC MAYBE NOT 160 HOURS OF COBOL.

      A      THAT IS STILL SCHOOL, ISN'T IT?  THAT IS
SCHOOL.

      Q      YOU CONSIDER THAT A SCHOOL ALSO?

      A      THAT IS DEFINITELY A SCHOOL.

      Q      SINCE SHE WAS IN SCHOOL.

      A      WHAT DID SHE GET IN THIS GRADE?

      Q      I AM SORRY, SIR.  I HAVE ASK THE QUESTIONS.

      A      CAN YOU TELL ME THAT?

      Q      YOUR ATTORNEY WILL HAVE A CHANCE TO ASK YOU
SOMETHING IF HE WANTS TO ASK YOU SOMETHING, OKAY.  BUT I - -

      A      WELL, OKAY.

      Q      DON'T  THE EMPLOYEES HERE TAKE COURSES
AT THE NCS  SCHOOL?

      A      OF COURSE.

      Q      AND THEY ARE CONSIDERED TO BE STILL IN
SCHOOL AND NOT QUALIFIED FOR POSITIONS?

      A      THEY ARE CONSIDERED TO BE STILL AND NOT



**SHARON L. BANKS REPORTING**

COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372 6922

FORM 2

1    QUALIFIED FOR POSITIONS?  THEY ARE STILL IN SCHOOL AND NOT

2    QUALIFIED FOR POSITIONS.   YOU HAVE TO BE WORKING HERE

3    IN A COMPUTER ANALYST POSITION.  YOU HAVE TO MEET THE

4    PREREQUISITES BEFORE YOU CAN EVEN GET INTO THE SCHOOL,

5    USUALLY.

6            Q        WOULDN'T THAT APPLY TO MS. TILDON?

7            A        WOULD IT APPLY TO MS. TILDON?  I WOULD THINK

8    SHE MET THE PREREQUISITES SINCE SHE HAS BEEN TO DIFFERENT

9    CLASSES  - -

10           Q        WHY WOULD SOMEONE HOLD NCS TRAINING AGAINST

11   HER?

12           A        THAT WAS NOT HELD AGAINST HER.  SHE WAS NOT

13   READY FOR PAYROLL AND I WOULD STILL SAY THAT.   I WOULD

14   NOT PICK HER FOR PAYROLL BASED ON MY INTERVIEWS WITH HER.

15   YOU KNOW, THIS WAS LATER.  AFTER I GOT TO KNOW MARGARET

16   TILDON, MARGARET COULD NOT HANDLE THE PAYROLL RESPONSIBILITY.

17   NOW, THAT IS WHAT I WOULD TAKE FROM INTERVIEWING MARGARET.

18   THAT IS FROM MY INTERVIEWING AND I WAS NOT OUT TO HURT

19   MARGARET. I WAS OUT TO TRY TO HELP HER.  BUT BASED ON

20   OUR  INTERACTION  I WOULD NOT HIRE MARGARET TILDON

21   FOR PAYROLL.

22           Q        WERE YOU AWARE THAT SHE HAD WORKED IN THE

23   COBOL ENVIRONMENT PRIOR TO HER ASSIGNMENT IN A 23?



1           A       I HAVE NOT SEEN IT.

2           Q       BUT YOU LOOKED AT HER PERSONNEL SUMMARY

3  AND YOU HAVE NOT SEEN IT?

4           A       RIGHT. THERE IS NOTHING IN THERE THAT SHE

5  HAS DONE COBOL WORK. SHE HAS DONE 204 WORK. SHE HAS NOT

6  DONE COBOL WORK.

7           Q       OKAY. LET ME DIRECT YOU TO PAGE 2 OF EXHIBIT

8  NUMBER 28 WHERE IT TALKS ABOUT CIVILIAN EXPERIENCE.

9           A       WOULD YOU MIND TELLING ME WHERE COBOL IS,

10  PLEASE?

11          Q       MAYBE I AM MISTAKEN, BUT USUALLY I AM NOT.

12          A       FIND IT.

13          Q       IF YOU WILL READ THE FIRST PARAGRAPH UNDER

14  SUMMARY NUMBER 9. READ IT ALOUD FOR THE RECORD.

15          A       WHAT THIS SAYS IS COMPUTER PROGRAMMING

16  OCTOBER, '83, '85, FLOW CHART DESIGN, WROTE, DEBUGGED AND

17  DOCUMENTED COBOL PROGRAMS. I JUST, YOU KNOW, I DID MISS

18  THAT. BUT - -

19          Q       WHAT ELSE DID YOU MISS IN THIS DOCUMENT?

20          A       I WOULD NOT SAY ANYTHING ELSE. BUT EVEN

21  IF I SAW THAT, THAT WOULD NOT BE ENOUGH. SHE WOULD HAVE

22  TO TELL ME SOMETHING ABOUT HERSELF AS FAR AS WHAT IT WAS

23  BECAUSE JUST SAYING SHE HAS DONE COBOL PROGRAMS, THAT DOES



NOT QUALIFY ANYBODY.   AND FROM TALKING TO MARGARET TILDON, SHE DID NOT KNOW ENOUGH LOGIC.  SHE DID NOT KNOW ANYTHING ABOUT PROGRAMMING.  TO ME SHE WAS VERY WEAK.

Q       BUT THE FACT OF THE MATTER IS YOU MISSED THAT.  DISCOUNTED HER COMPUTER PROGRAMMING HERE AT NCS AND YOU ARE SAYING SHE IS NOT QUALIFIED WITHOUT LOOKING AT ANY OF HER WORK AND WITHOUT PERFORMING AN IN DEPTH EVALUATION; IS THAT CORRECT?

A       YES. I DID.  NO, THAT IS NOT CORRECT.

Q       WHEN WAS THE IN DEPTH EVALUATION?  YOU DID NOT EVEN KNOW SHE WAS A COMPUTER PROGRAMMER UNTIL TODAY.

A       I HAVE HAD ENOUGH.

Q       YOU CAN STOP AT ANY TIME.

A       BECAUSE I FEEL LIKE I AM BEING INSULTED, COMPLETELY.  I FEEL  LIKE MARGARET TILDON NEEDED SOME HELP AND I KNEW SHE WAS A COMPUTER PROGRAMMER AND I TALKED TO HER AND SHE CAN SIT THERE AND SHAKE HER HEAD ALL SHE WANTS.  I MET HER ON TWO DIFFERENT OCCASIONS AND TRIED TO HELP HER.

Q       MR. JACKSON.

A       AND THIS IS WHAT YOU GET, MUD.

Q       MR. JACKSON, NO ONE IS TRYING TO SAY ANYTHING IT WAS YOUR TESTIMONY THAT YOU DID NOT KNOW SHE WAS A COBOL PROGRAMMER FOR '83 TO '85.



**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372-6922

1     A     I DID NOT - -

2     Q     WHEN I ASKED YOU TO READ THIS, YOU DID NOT

3 SEE IT. YOU ASKED ME TO SHOW IT TO YOU AND YOU READ IT

4 AND SAID I MISSED IT. BUT THAT IS YOUR TESTIMONY. SO, NOBODY

5 IS TRYING TO DO ANYTHING TO YOU.

6     A     I MISSED THAT RIGHT AS WE SIT HERE. BUT

7 WHERE DID SHE DO COBOL PROGRAMMING? MY DIVISION IS THE

8 ONLY ONE THAT DOES COBOL. I FIND IT VERY HARD TO BELIEVE.

9     Q     LET ME ASK YOU THIS QUESTION: DOES COBOL

10 CHANGE FROM DIVISION TO DIVISION?

11     A     IT IS ONLY DONE AT ONE PLACE. THERE IS

12 NO COBOL PROGRAMMING DONE HERE.

13     Q     IS THERE COBOL DONE OUTSIDE OF HERE?

14     A     IN THE BUSINESS WORLD, YES.

15     Q     IS COBOL PRETTY MUCH COBOL LIKE PS 1 IS

16 PRETTY MUCH LIKE PS 1?

17     A     THERE COBOL HAS CHANGED. THERE IS COBOL

18 2 NOW.

19     Q     DOES COBOL 2 BUILD ON COBOL 1?

20     A     I WOULD THINK SO.

21     Q     IF SHE PROGRAMMED ON COBOL 1, WOULDN'T YOU THINK

22 SHE COULD PROGRAM ON COBOL 2?

23     A     YES.


**SHARON L. BANKS REPORTING**
COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372-6922

1          MR. PEARSON:  I HAVE NO FURTHER QUESTIONS.

2          CROSS EXAMINATION

3          BY MR. PRICE:

4          Q     IF IT SAYS SHE DID COBOL IN 1983 TO 1985.

5 DID ANY OTHER PLACE IN THE AGENCY DO COBOL?

6          A     I WOULD LIKE TO KNOW WHERE SHE DID THIS

7 BECAUSE I DON'T BELIEVE IT.

8          Q     IS THAT PRETTY WELL KNOWN WE DON'T DO COBOL

9 AT NSA?

10          A     WE DO COBOL ON THE BUSINESS SIDE, BUT NOT

11 ON THE MISSIONS.  WE DON'T DO IT ON THE MISSIONS SIDE.

12          Q     ONE OTHER QUESTION, MR. PRICE.  MR. WISEMAN,

13 WOULD HE HAVE ANY RECALL THAT - - WOULD YOU BE SURPRISED

14 IF HE CAN NOT REMEMBER MARGARET TILDON'S CASE?

15          A     I WOULD BE SURPRISED IF HE COULD REMEMBER IT.

16          Q     OKAY.

17          A     BECAUSE I MEAN IT WAS JUST SOMETHING THAT

18 I BELIEVE THAT SHE WAS INTERVIEWED AND SHE DID NOT COME

19 THROUGH VERY WELL WITH THAT INTERVIEW.

20          MR. PRICE:  I DON'T HAVE ANY OTHER QUESTIONS.

21          REDIRECT EXAMINATION

22          BY MR. PEARSON:

23          Q     ONCE HE ASKS YOU QUESTIONS, I AM ENTITLED TO



23

1   ASK YOU ADDITIONAL QUESTIONS.

2       Q       YOU ARE CERTAIN YOU KNOW OF NO OTHER

3   DIVISION IN NSA THAT USES COBOL?

4       A       YES.  I AM CERTAIN.  I KNOW OF NO OTHER DIVISION

5   THAT USES COBOL OTHER THAN ON OUR SIDE, WHICH WAS THE FORMER

6   T 324

7       Q       YOU DON'T KNOW BILL STROH?

8       A       NO.

9       Q       DO YOU KNOW ANYONE IN GROUP G 75?

10      A       NO.

11              MR. PEARSON:  I HAVE NO FURTHER QUESTIONS.

12  THANK YOU.

13          (THE DEPOSITION WAS CONCLUDED AT  3:05 O'CLOCK P.M.)

14          (SIGNATURE NOT WAIVED.)

15

16

17

18

19

20

21

22

23




**SHARON L. BANKS REPORTING**

COURT REPORTERS
P.O. BOX 44773
FORT WASHINGTON, MARYLAND 20744
(301) 372 8922

24

## SIGNATURE PAGE

I HAVE READ THE FOREGOING  23   PAGES, WHICH CONTAIN A CORRECT TRANSCRIPT OF THE ANSWERS MADE BY ME TO THE QUESTIONS THEREIN RECORDED.

_____

SIGNATURE

25

## CERTIFICATE OF NOTARY PUBLIC, REPORTER

1
2
3       I, SHARON L. BANKS, THE OFFICER BEFORE WHOM THE FOREGOING
4  DEPOSITION WAS TAKEN, DO HEREBY CERTIFY THAT THE WITNESS
5  WHOSE TESTIMONY APPEARS IN THE FOREGOING DEPOSITION WAS DULY
6  SWORN BY ME, THAT THE TESTIMONY OF SAID WITNESS WAS TAKEN BY
7  ME IN STENOTYPE AND THEREAFTER REDUCED TO TYPEWRITING UNDER MY
8  DIRECTION; THAT SAID DEPOSITION IS A TRUE RECORD OF THE
9  TESTIMONY GIVEN BY SAID WITNESS, THAT I AM NEITHER COUNSEL
10 FOR, RELATED TO, NOR EMPLOYED BY ANY OF THE PARTIES TO THE
11 ACTION IN WHICH THIS DEPOSITION WAS TAKEN; AND FURTHER, THAT
12 I AM NOT A RELATIVE OR EMPLOYEE OF ANY ATTORNEY OR COUNSEL
13 EMPLOYED BY THE PARTIES HERETO, NOR FINANCIALLY OR OTHERWISE
14 INTERESTED IN THE OUTCOME OF THE ACTION.
15
16
17 _____
18                SHARON L. BANKS, NOTARY
19
20 MY COMMISSION EXPIRES:
21
22
23



**NOT TO BE ACCEPTED BY OTHER SCHOOLS WITHOUT REGISTRAR'S SEAL**

# HOWARD UNIVERSITY
## WASHINGTON, D.C.
## OFFICE OF THE REGISTRAR

**LIBERAL ARTS COLLEGE**

**STUDENT I.D. NUMBER** 800380

**Permanent Record**

| | |
|---|---|
| LAST NAME | Tildon |
| FIRST | Margaret |
| MIDDLE | Inez |
| SEX | F |
| DATE OF BIRTH | 3/24/47 |
| PLACE OF BIRTH | Washington, D. C. |
| DATE ENTERED | 6/68 |

**Preparatory Record**

ADMITTED FROM: College Record — Morgan State

DATE GRAD.:

RANK IN CLASS:

**BASIS FOR ADMISSION**

High School Units

ENTRANCE DEFICIENCIES:

REMOVAL OF ENTRANCE DEFICIENCIES:

| DEPT. AND COURSE NUMBER | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINTS |
|---|---|---|---|---|
| | **ADVANCED STANDING, MORGAN STATE COLLEGE** | | | |
| P. E. | H. Ed. — | 3 | | |
| PHY. SC. | 001 | 6 | | |
| SOC. SCI. | 011, 012 | 6 | | |
| HUMANI. | 011, 012 | 6 | | |
| ECON. | 001 | 3 | | |
| HIST | 110 | 3 | | |
| MUSIC | 100 | 2 | | |
| | **ADVANCED STANDING, CENTRAL STATE COLLEGE** | | | |
| BUSINESS | 015 | 3 | | |
| ENGLISH | 002  003 | 6 | | |
| P. E. | — | 1 | | |
| PSYCH | 051 | 3 | | |
| | TOTAL HOURS | 42 | | |
| | **SUMMER SESSION, 1968** | | | |
| CC1 001 | BIOLOGICAL SCIENCES | 3.00 | C | 6.00 |
| C36 051 | PRINCIPLES OF SPEECH | 3.00 | C | 6.00 |
| | **FIRST SEMESTER, 1968-69** | | | |
| 012 001 | NAT GOVT OF U S | 3.00 | C | |
| 013 009 | HIST OF U S BEF 1865 | 3.00 | | |
| 013 109 | U S HIST BEFORE 1865 | 4.00 | | |
| 035 001 | ELEMENTARY SPANISH | 3.00 | C | |
| 013 129 | ELEM SPANISH | 3.00 | C | |

| DEPT. AND COURSE NUMBER | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINTS |
|---|---|---|---|---|
| | Advanced Standing | | | |
| 013 126 | EUROPE 1500 – 1815 | 3.00 | C | 6.00 |
| 013 129 | SECOND SEMESTER, 1968-69 | | | |
| 013 129 | HIST OF LAT AM 1830 | 3.00 | B | 9.00 |
| 013 139 | CHINA 19TH&20TH CENT | 0.00 | WP | |
| 02C 015 | BASKETBALL | 1.00 | B | 3.00 |
| 018 051 | ELEM SPANISH | 4.00 | C | 12.00 |
| 035 002 | ELEM SPANISH | 3.00 | C | 6.00 |
| | **FIRST SEMESTER 1969-70** | | | |
| 013 151 | STATE & LOCAL GOVT | 3.00 | B | 9.00 |
| 013 177 | NEG HIST SINCE 1870 | 3.00 | B | 9.00 |
| 014 107 | NEG IN US SINCE 1865 | 3.00 | B | 9.00 |
| 014 127 | CONSUMER EDUCATION | 3.00 | B | 9.00 |
| 035 004 | INTERMEDIATE SPANISH | 3.00 | C | |
| | **SECOND SEMESTER, 1969-70** | | | |
| | MOD EUR SINCE 1870 | 3.00 | B | 9.00 |
| | LEATHER CRAFTS | 3.00 | A | 12.00 |
| | INTERMEDIATE SPANISH | 3.00 | | |

OFFICIAL TRANSCRIPT
ISSUED DIRECTLY
TO STUDENT

**GENERAL MEMORANDA**

Dropped — Page Scholarship —
Graduated — June 5, 1971

This student is entitled to honorable dismissal unless otherwise indicated.

Academic Probation:

CERTIFICATION

**NOT TO BE ACCEPTED BY OTHER SCHOOLS WITHOUT PER...**

HOWARD UNIVERSITY
WASHINGTON, D. C.

Page 2

LIBERAL ARTS

TILDON,          Margaret     Inez          800380

| DEPT. AND COURSE NUMBER | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINTS |
|---|---|---|---|---|
| | SUMMER SESSION 1970 | | | |
| 013 122 | RISE ANCIENT AFR CIV | 3.00 | C | 6.00 |
| 031 102 | ECONOMIC GEOGRAPHY | 3.00 | C | 12.00 |
| *102* | | *6.0* | *300* *168* | *161* |
| | | | *268* | |
| | FIRST SEMESTER 1970-71 | | | |
| 010 001 | PHYSICAL GEOLOGY | 3.00 | A | 12.00 |
| 013 187 | IMPERL AND AFRICA | 3.00 | B | 9.00 |
| 013 575 | SENIOR SEMINAR | 3.00 | A | 12.00 |
| 031 101 | WORLD GEOGRAPHY | 3.00 | C | 6.00 |
| 031 111 | NORTH AMERICA | 3.00 | B | 9.00 |
| *117* | | *15* | *330* *278* | *48* *209* |
| | | | *75* | |
| | SECOND SEMESTER 1971 | | | |
| 013 149 | HIST OF BRAZIL | 3.00 | B | 9.00 |
| 013 174 | RECONSTRUCTION | 3.00 | C | 6.00 |
| 031 105 | POLITICAL GEOG | 3.00 | A | 12.00 |
| *136* | | *9* | *300* *97* | *236* |
| | | | *2.88* | |

General Information

| DEPT. AND COURSE NUMBER | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINTS |
|---|---|---|---|---|
| | | | | |

This is a true and accurate copy of the record on file in this office.

# HOWARD UNIVERSITY
WASHINGTON, D. C.

## OFFICE OF REGISTRAR
### AND
## DIRECTOR OF RECORDING

| MR. MRS. MISS | LAST | FIRST | MIDDLE | | 800 380 |
|---|---|---|---|---|---|
| | TILDON, MARGARET | | T. | | I.D. NUMBER |

DATE OF BIRTH   3/24/47   SEX   F

EDUCATIONAL HISTORY:

HOWARD UNIVERSITY   GRADUATED   1971   B.A.
UNDERGRADUATE COLLEGE   YR.   DEGREE

School or College _____ GRADUATE

Date Entered _____ SEPTEMBER 1972

Degree Sought _____ Master of Arts in Teaching

Major _____

| DEPT. AND COURSE NO. | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINT |
|---|---|---|---|---|
| TILDON | MARGARET   I   800380 | | | |
| | FIRST SEMESTER 1972-73 | | | |
| 146 156 | TEACH SEC AT SEC SCH | 3.00 | A | 12.00 |
| 2 7 215 | STAT METHODS I | 3.00 | A | 12.00 |
| 2 1 221 | HUMA GROWTH & DEV | 3.00 | B | 9.00 |
| 391 | ED & MIN GRP PROBS | 3.00 | B | 9.00 |
| 393 | PRETLEP IN DRG E | 3.00 | A | 12.00 |
| 375 | RESEARCH IN CURRICH | 12.00 | | |
| | EARNED 12.0 ATTEMPTED 12.0 | 3.55 | | 42.0 |
| | EARNED 12.0 ATTEMPTED 12.0 | 3.50 | | 42.0 |
| TILDON | SPRING SEMESTER 1973   800380 | | | |
| 145 135 | DES & ST IN SEC SCH | 6.00 | A | 24.00 |
| 207 200 | INTRO TO RESEARCH | 3.00 | B | 9.00 |
| | EARNED 9.0 ATTEMPTED 9.0 | 3.66 | | 33.0 |
| | EARNED 21.0 ATTEMPTED 21.0 | 3.57 | | 75.0 |

| DEPT. AND COURSE NO. | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINT |
|---|---|---|---|---|
| TILDON | MARGARET   I   800380 | | | |
| | FIRST SEMESTER 1973 | | | |
| 207 225 | ADV MEAS & EVAL | 3.00 | B | 9.00 |
| 212 213 | ENGLISH CARIBBEAN | 3.00 | A | 12.00 |
| | SEM: EARNED 6.0 ATTEMPTED | 3.50 | | 21.0 |
| | CUM: EARNED 33.0 ATTEMPTED 33.0 | 3.63 | | 120.0 |
| TILDON | CANCELLED REGISTRATION 1/8/74 | | | |
| | SPRING SEMESTER 1974 | | | |
| 207 379 | RESEARCH IN CRT | 0.0 | | 0.00 |
| 212 335 | SEM US TO U5 | 0.00 | | 0.00 |
| | SEM: EARNED 0.0 ATTEMPTED | 0.00 | | 0.00 |
| | CUM: EARNED 33.0 ATTEMPTED 33.0 | 3.63 | | 120.0 |
| TILDON | MARGARET   I   800380 | | | |
| | FALL SEMESTER 1974 | | | |
| 207 370 | PROBS CURR & TEACH | 3.0 | F | 12.0 |
| | EARNED 3.0 ATTEMPTED | 3.00 | | |
| | EARNED 36.0 ATTEMPTED 36.0 | 3.66 | | 132.0 |
| | SPRING SEMESTER 1975   800380 | | | |
| 212 226 | U S SING | 0.0 | W | 0.00 |
| 212 243 | LA/CAR B 1850 TO PRE | 3.0 | W | 0.00 |
| | SEM: EARNED | 3.50 | | 21.0 |
| | CUM: EARNED | 3.66 | | 152.0 |

ACADEMIC STATUS

GRADUATED: December 21, 1977
DEGREE: M.A. (Teaching)

CERTIFICATION

This student is entitled to honorable dismissal unless otherwise indicated.

OFFICIAL TRANSCRIPT
ISSUED DIRECTLY
TO STUDENT

NOT TO BE ACCEPTED BY OTHER SCHOOLS WITHOUT REGISTRAR'S SEAL

**HOWARD UNIVERSITY**
WASHINGTON, D.C.

| DEPT. AND COURSE NO. | COURSE DESCRIPTION | SEM. HRS. | GRADE | QUALITY POINTS |
|---|---|---|---|---|
| | **TILDEN     MARGARET     I     800380** | | | |
| | SUMMER SESSION 1975 | | | |
| 213 176 | NON-AMER ID LIVES | 3.00 | A | 12.00 |
| 207 276 | INDEPENDENT STUDY | 1.00 | A | 4.00 |
| 212 349 | READ IN LAT AMER | 3.00 | A | 12.00 |
| SEM: | EARNED 7.0 ATTEMPTED 7.0 | 4.00 | 28.0 | |
| CUM: | EARNED 49.0 ATTEMPTED 49.0 | 3.69 | 181.0 | |
| | **TILDEN     MARGARET     I     800380** | | | |
| | FIRST SEMESTER 1976 | | | |
| 291 301 | ED RES II CURR & TEA | 3.00 | XA | 12.00 |
| SEM: | EARNED 3.0 ATTEMPTED 3.0 | 4.00 | 12.0 | |
| CUM: | EARNED 52.0 ATTEMPTED 52.0 | 3.71 | 193.0 | |
| | **TILDEN     MARGARET     I     800380** | | | |
| | SUMMER SESSION 1977 | | | |
| 251 302 | EDUCATIONAL RES III | 1.00 | A | 4.00 |
| SEM: | EARNED 1.0 ATTEMPTED 1.0 | 4.00 | 4.0 | |
| CUM: | EARNED 53.0 ATTEMPTED 53.0 | 3.71 | 197.0 | |
| | **TILDEN     MARGARET     I     800380** | | | |
| | FIRST SEMESTER 1977 | | | |
| 251 301 | ED RES III CURR & TEACH | 1.00 | A | 4.00 |
| SEM: | EARNED 1.0 ATTEMPTED 1.0 | 4.00 | 4.0 | |
| CUM: | EARNED 54.0 ATTEMPTED 54.0 | 3.72 | 201.0 | |

**Prince George's Community College • 301 Largo Road • Largo, Maryla   ⁊774-2199**

| COURSE NUMBER | COURSE TITLE | GRADE | CRS. | QUAL PTS. |
|---|---|---|---|---|
| CIS 111 | COMPUTER PROGRAMMING I | B | 4 | 12 |

| GRADING SYSTEM | |
|---|---|
| GRADE | PT |
| A - EXCELLENT | 4 |
| B - GOOD | 3 |
| C - AVERAGE | 2 |
| D - PASSING | 1 |
| F - FAILURE | 0 |
| H - AUDIT | 0 |
| I - INCOMPLETE | 0 |
| W - WITHDREW | 0 |
| P - PASS | 0 |
| Q - NON-ATTENDANCE | 0 |
| TP - DEFERRED | 0 |

| CREDITS EARNED SUMMARY | | | PREVIOUS CUMULATIVE | | | CURRENT SEMESTER | | | NEW CUMULATIVE | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| P. O. CR. | TPL. CR. | TOTAL CREDITS | CREDITS | Q. PTS. | G.P.A. | CREDITS | Q. PTS. | G.P.A. | CREDITS | Q. PTS. | G.P.A. |
| 7 | 0 | 7 | 3 | 9 | 3.00 | 4 | 12 | 3.00 | 7 | 21 | 3.00 |

DISCREPANCIES MUST BE REPORTED TO THE RECORDS OFFICE BEFORE THE END OF THE NEXT REGULAR SEMESTER

| ACADEMIC STATUS |
|---|
| GOOD STANDING |

| SEMESTER | STUDENT NUMBER |
|---|---|
| FALL 96 | 5050 |

```
TILDON MARGARET I
1014 BARNSBURY CT
CAPITOL HGTS        MD
20743-0000
```

EXHIBIT 19

## COMPUTER INFORMATION SYSTEMS (CIS)

Unless otherwise indicated, CIS courses meet for 3 class hours per week, or equivalent. NOTE: All CIS prerequisites must be passed with a grade of C or higher. For more information, call (301) 322-0752.

**CIS 111. COMPUTER PROGRAMMING I. 4 CREDITS**

Introduction to computer programming with emphasis on program logic, algorithms, and elementary program design. The C language is used. Prerequisites: CIS 101 or equivalent, completed or concurrent. 3 class/2 lab hrs.

## UNOFFICIAL GRADE NOTICE

NAME: Margaret Tildon

ORG:  A2352

DATE:  8 June 1989

YOU HAVE PASSED THE MP-185 COURSE (CLASS #03-89/890403-890512) WITH A LETTER GRADE OF    B    .

YOUR NUMERIC SCORES ARE AS FOLLOWS:

PROJECT AVERAGE:    98 %

QUIZ AVERAGE:    95 %

FINAL EXAM:    75 %

FINAL AVERAGE:    86 %

AN OFFICIAL GRADE CARD WILL BE ISSUED TO YOU SHORTLY. CONGRATULATIONS ON A JOB WELL DONE!!

MARY CLULOW
E53
MP-185 INSTRUCTOR

*It was great having you in class. Keep up the good work!*

UNITED STATES GOVERNMENT

# memorandum

**DATE:**  4 November 1982

**REPLY TO**
**ATTN OF:**  G

**SUBJECT:**  Payment of Cash Award

☐ Military Personnel

☒ Civilian Personnel

**TO:**  Finance and Accounting Officer
N41

In accordance with NSA/CSS Regulation 30-9, it is requested that the following check be issued:

| NAME OF AWARD RECIPIENT | | GRADE OR RANK AND BRANCH OF SERVICE *(if applicable)* |
|---|---|---|
| Margaret I. Tildon | | GGD 07/04 |

| SERVICE OR SOCIAL SECURITY NUMBER | ASSIGNED ORGANIZATION | AMOUNT OF AWARD |
|---|---|---|
| 5690 | G73 | $100.00 |

**BASIS FOR CASH AWARD**

☐ Suggestion No.
☐ Sustained Superior Work Performance
☒ Special Performance Cash Award
☐ Special Act/Service
☐ Scientific Achievement
☐ Invention No.
☐ Other *(Specify type of award)*

| NAME AND TITLE OF APPROVING OFFICIAL | FUNDING ORGANIZATION |
|---|---|
| M. H. IREDELL, CHIEF G | G |

**DISPOSITION OF CHECK**  Handcarry with paychecks
☐ Hold for pick-up by the below named individual          ☐ Mail to:

| NAME | PHONE *(Secure-Outside)* |
|---|---|
| Jill Hagberg | 1193s  6107b |

**COMPLETED BY** *(Signature)*

TITLE AND ORGANIZATION

G AWARDS SECRETARY

FORM P9578 REV NOV 81 *(Supersedes P9578 REV JUL 78 which is obsolete)*

| N41 USE ONLY |
|---|
| AWARD CODE |



**Buy U.S. Savings Bonds Regularly on the Payroll Savings Plan**

☆U.S. Government Printing Office:1978—241-530/3016

OPTIONAL FORM NO. 10
(REV. 7-76)
GSA FPMR (41 CFR) 101-11.6
5010-112

NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755

20 August 1985

MISS MARGARET I TILDON
G75
National Security Agency/
  Central Security Service

DEAR MISS TILDON

I am pleased to announce your promotion to
GGD0901 effective AUGUST 25, 1985.

The official NSA form 3150 actually effecting
your promotion will be delivered to you shortly after
the effective date of the promotion.

Congratulations and best wishes for continued success.

VIRGINIA C. JENKINS
Director of Civilian Personnel

Margaret Tildon:

    Request your attendance at a
ceremony to receive a promotion to GGD-09.

        DATE:  23 August 1985
        TIME:  1345  (Seating time 1330)
        ROOM:  9A135
        PRESENTER:  ███████████

ATTENDING:  Mrs. Girvan
            Mrs. Daft

Pictures will be taken.

*Mrs Tildon*

NSA Test Scores (Examinations given prior to entrance on board at NSA) One of the 4's represents Computer Programming Categories.

SECURITY CLASSIFICATION (IF ANY)

EMPLOYEE PERFORMANCE APPRAISAL

RETURN TO M35 BY
860223

| SSN (1) | NAME (Last, First, MI) (2) | COSC/GRADE (3) |
|---|---|---|
| 5690 | TILDON MARGARET I | 232BN/GGD0901 |

| JOB NUMBER (4) | ORGANIZATION (5) | APPRAISAL PERIOD (6) from date | to date |
|---|---|---|---|
| 232EO9N10 | G75 | 85/04/17 | 860123 |

SUMMARY OF SIGNIFICANT JOB ACCOMPLISHMENTS AND/OR DEFICIENCIES (COMMENTS ARE REQUIRED.)

Miss Tildon developed COBOL programs on CARILLON for G731 and G752 applications. She was able to develop, test, document, and use programs which do straightforward editing, accounting, and reformatting of data. She also executed some statistical programs for G752 monthly.

She worked very industriously in writing and using programs, but she requires a better understanding of computer processing techniques to become more independent, creative, and efficient in computer processing assignments. Extensive training will be required to meet these goals.

Miss Tildon was reassigned to G721 as of 15 December 1985 and her job title changed to 112AN at her request.

EFFORTS IN PROMOTING EEC OBJECTIVES
This rating applies to all supervisors)

ACCEPTABLE ☐    UNACCEPTABLE ☐

SECURITY SUPERVISION
(This rating applies to all supervisors)

ACCEPTABLE ☐    UNACCEPTABLE ☐

PERFORMANCE RATING: Enter an X in the box which most accurately reflects the employee's level of performance. Consider the quality and quantity of work produced, amount of supervision required, practical judgement in solving problems, dependability, waste prevention, and cost reduction efforts.

EXCELLENT ☐        SATISFACTORY ☒

A rating of U requires documentation in accordance with PMM Chapters 340 and/or 353. Even though certification of a within-grade increase will not be done on this form, a rating of U indicates employee is not eligible for a within-grade increase until such time as the rating level is brought up to level S or E.

UNSATISFACTORY ☐

| Rating Supervisor Signature *Edward L Hultgren* | Title | Date |
|---|---|---|
| EDWARD L. HULTGREN | Chief, G751 | 20 FEB 86 |

Reviewing Official Comments (optional)

| Reviewing Official Signature *William H Stroh* | Title | Date |
|---|---|---|
| WILLIAM H. STROH | D/Chief, G75 | 20 FEB 86 |

PRIVACY ACT STATEMENT (applicable to employee comments): Authority for requesting information: PL 86-36, DOD Dir 5100.23, PMM 340. Information will be used principally to provide an official statement of the employee's comments on the performance appraisal & (routine) will be retained in Official Personnel Folder as a reference for authorized personnel officers and managers. Disclosure of this information is voluntary. Effect on the individual if requested information is not provided: may result in management decisions based upon data which did not include employee input. Your signature below also indicates that you have read and understood the above.

MY SIGNATURE MEANS THAT I HAVE REVIEWED THIS DOCUMENT AND DISCUSSED THE CONTENTS WITH MY SUPERVISOR. HOWEVER IT DOES NOT IMPLY THAT I AGREE WITH THIS EVALUATION.

Employee Comments (optional)

*As a result of certain ugly incidences that have occurred in this office, under the super-vision of the above signed individuals, I cannot and will not agree with this application.*

| Employee Signature (see Privacy Act Statement) *Margaret Tildon* | Title *Former Computer Programmer* | Date *Mar 86* |
|---|---|---|

REVISED JANUARY 85 (Supersedes PIC APRIL 80 which is obsolete)
FM 7540-FM-001-0003

SECURITY CLASSIFICATION (IF ANY)

OFFICE OF CIVILIAN PERSONNEL COPY

Informal Counseling for Margaret I. Tildon, 2¿ July 1989

Before I begin I want to let you know that you are requested to sign this counseling statement simply to indicate that I have gone over its contents with you and then you will have the opportunity to sign a similar form with your responses to be attached.

It has been detected that you seem to be unwilling to work on a team basis (the word team also embracing our small branch).

We know you have medical problems and that these problems prohibit you from pushing or lifting anything heavy; however, being asked to accompany someone to the basement to make distro pickup is a request for help in opening doors, holding locker doors open, holding on to the keys... , NOT to actually do the lifting or pushing of anything heavy. Also, sometimes it's just for the company.

There appears to be a lack of cooperation in helping to keep the traffic in the machine room broken down.  You may certainly ask someone to lift the stack of paper to the table, but I see no reason why you are unable to break down the traffic for distribution.; likewise if a printer is out of paper, someone (even one of the analysts), if nicely asked, would be glad to place the full box of paper in the machine so you could then thread it through.  Ribbon changing is greatly appreciated by those who must read all that traffic and is certainly another courtesy you are capable of extending.

You have been requested to pick up mail on the days that you are the first one in the division to pick up the key, but your immediate response was your inability to do this without even considering how much mail was involved or offering to pick up at least some of the mail.  Certainly if there was a heavy load you would not be expected to bring it all back, but the effort and willingness would be appreciated.

In working in a file-cycle support branch such as ████ you must be willing to learn as much as you possibly can in all aspects of such a branch's duties to the division; and, more importantly, you need to express the initiative to give help where it is needed and to have the insight and interest enough to see when it is needed.

It's true that you have come to me and asked me if I had any SPECOL requests for you to do and that you have been handling the logon requests with no problems and you do well at those things you are willing to do, but you need to be willing to do even those things which you do not feel you want to do, to volunteer your much-needed help, and to do so with a little interest and maybe even some enthusiasm for being a team player.

Most recently, you have been asked to help in completing the tedious task of terminal identification throughout the division.  This was requested to be done as soon as possible.  Unfortunately, another team member had to be asked for help since you expressed an unwillingness to help in completing the task.

Several weeks ago you were requested to work on an important C-program project.  You were to do it at your own pace and were assured that help was available as needed yet you chose to refuse to accept the task which means it was a waste of time to even have you take the C-Language course.  If you had at least said that you weren't sure if you could do it, but that you would at least try, it would have shown much more initiative and willingnesss to fit in as a member of the branch team.

It has also been brought to the attention of this branch that you have been seen 'dozing off'.  I understand that you are on medication, but perhaps a change in your hours would be helpful, since 0530 is very early, or perhaps a talk with your doctor to have your medication changed

should be considered.

I really feel you could be an asset to this branch if you would be more willing to apply yourself and be more cooperatiave and work on a team basis, extending a request to help and indicating a sincere desire to do so with a little enthusiasm as I have occasionally seen you do.

Basically, at this time we need to know if there is a problem. Are you unsatisfied with your job here and if so, why? If you are unhappy here, please let us know so we can work at freeing up your billet and allow you the opportunity to find a more fulfilling position.

_____
Margaret I. Tildon

~~███████████████████~~ Chief ~~██████~~     7/20/89

_Prior formal discussion with supervisor in the presence of the IG's representatives._

_Margaret Tildon_

MEDICAL PRIVILEGED INFORMATION

NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE

DATE:    25 SEPTEMBER 1989

REPLY TO: ▓▓, HANDICAP COORDINATOR

SUBJECT: PHYSICAL RESTRICTIONS ON DUTY
         ASSIGNMENT OF TILDON MARGARET I,
         SSN: ▓▓▓5690

TO:      CHIEF, ▓▓▓

Reference NSA/CSSPMM Chapter 601, Health Service (Civilian).

The Medical Center ▓▓ has verified that the subject individual has a handicap and that the physical restriction(s) listed below apply to the duty assignment of the individual.

NO STRENUOUS ACTIVITY
NO HEAVY LIFTING - OVER 10 POUNDS
NO PUSHING

Consideration should be given to reassignment of the individual if the above restriction(s) appear to be incompatible with satisfactory duty performance and the duties cannot reasonably be modified to accommodate the restriction(s).

An appropriate notation concerning the physical restriction(s) should be placed in your division level records. In order to protect the personal privacy of the subject individual, you should restrict access of this information only to those persons who are responsible for the subject individual's work assignments and safety. If you are reassigned please ensure your replacement is informed of this individual's status. This record should be maintained in a lockable container.

If there are questions regarding this matter, please contact the medical facility closest to you: APS I (859-6155), FANX III (859-6667), OPS I (688-7263) or ▓▓ BUILDING (688-7041), or you may contact the ▓▓ Handicap Coordinator (859-6667 or 968-8960).

Please acknowledge receipt of the above information by signing your name, identifying the date, and returning this entire form to the ▓▓ Handicap Coordinator, Fanx Medical Center, FANX III, Rm. B6A31.

Re-evaluation or expiration date is 07 SEPTEMBER 90.



Handicap Coordinator

CC: Chief, ▓▓▓▓▓▓

I certify that the above physical restriction(s) have been noted.

Immediate Supervisor's Signature _____    Date _____

Employee's Signature _____    Date _____

MEDICAL PRIVILEGED INFORMATION

PERSONNEL PRIVILEGED
INFORMATION

7 November 1989

SUPERVISORY EVALUATION

NAME:  Tildon, Margaret                        GRADE: 9
POSITION TITLE:  Computer Programmer           CURRENT PERFORMANCE:  E
ORGANIZATION: ████                             AND DATE:  890119
POSITION IS NOT SUPERVISORY

---

1. Physical Attributes
        Due to physical restrictions, as indicated by her doctor,
she is unable to perform all duties as assigned.  On occasions
individuals within ████ have informed me that she is "dozing off"
during normal duty hours.  She has indicated that this was the
result of eye irritation or because of the side effect of medication
for allergies.

2. Personality and Character
        She does not interact well with other individuals and
presents the appearance of a solitary individual not wishing to get
involved in team activities.

3. Mental Attributes
        She expresses a feeling that individuals within the office
have ulterior motives in the way they treat her, the impression that
everyone is out to get her.  This attitude is indicated in her
rebuttal remarks in which she indicated that on several occasions
individuals walked by without volunteering their assistance in what
can be considered trivial matters.

4. Leave Practices
        Mrs. Tildon does not use a significant amount of sick leave.

5. Direction of Others
        Questions all new assignments and presents excuses as to why
she can't complete or perform the task.  Directions for completion
of assigned tasks must be given several times before there is
complete understanding.

6. Potential
        As her supervisor I do not see a potential for advancement
above her current position.  She lacks ambition and drive that may
be related to her physical limitations.  Her educational background
indicates she should be capable of better performance.

7. Work Habits
        She is unwilling to offer assistance to others when the
workload is overwhelming; she is unwilling to learn new procedures
or operations.  She has indicated that she has done things for this
office which she feels she did not want to do, and has indicated
that these tasks were very tedious, even though others have
performed these tasks without complaints.  On occasion she has been
noticed leaving 10-15 minutes early and, when asked, she uses the
excuse that it takes her this time to walk to her car as if this was
time that should be taken against regular work hours and not on her
own time.

PERSONNEL PRIVILEGED
INFORMATION

PERSONNEL PRIVILEGED
INFORMATION

8.   Strongest Assets
        Has a willingness to work when the task or project is
satisfactory and is to her liking.

9.   Greatest Weaknesses
        Her physical limitations as well as her mental attitude when
interacting with others in the office has caused great difficulties
for the branch in allocating assignments.

10.  Supervisory Actions
        She has been counseled about her strength and weaknesses in
relationship to job performance, at which time she rebutted that we
as her supervisors were directing our actions against her and that
no other individual within the branch had ever been treated in a
like manner.

Remarks:
        In order to get a true picture of her attitude and physical
state one should read the informal counseling and rebuttal dated
July 20, 1989 in its entirety.

_Chief_

Sig             osition Title

PERSONNEL PRIVILEGED
INFORMATION

6 December 1989

TO:  Margaret Tildon

FM:  Richard E. Morson

IAW NSA/CSS PMM 30-2, Para 2-4, I acknowledge receipt of your note of November 27, 1989 announcing your intent to submit a formal grievance to M3A.

A statement of the grievance to the person complained against and a written response by that person have already been accomplished.

I have reviewed both statements, talked to your supervisors, and agree to comply with your request to seek employment elsewhere. I have already met with M3A on this matter and they are cooperating with us to find you a position.

This memo formalizes our discussion of 30 November.  If you have not already done so, you may pursue your grievance in writing within 5 working days.


cc:  A204 (Betty Kreiner)
     M3A (Dianne Miller)
     A235 (Michael January)

Memo To    :  General Counsel
From       :  Margaret Tildon, A2352
Date       :  8 December 1989

Subject    :  Release of Information


     I hereby request that the following information be released to
my attorney, Alan Banov, Esq., 1815 H Street, N.W., Suite 700,
Washington, D.C.  20006, and that any other correspondence and/or
telephone conversations be directed to him at (202) 822-9699 and/or
fax 822-6392:

     Personnel folder (copy of all papers)
     Medical records  (copy)
     EEO papers (copy)
     Grievance papers (adverse actions - copies)
     I.G. files (copies)
     Pay records

     In addition, I am requesting on behalf of Attorney Banov, an
NSA address to which written correspondence may be submitted.


cc: Rona Lerner
    Pat Schuyler

# ALAN BANOV, Attorney-at-Law

June 20, 1991

1815 H Street, N.W., Suite 700
Washington, D.C. 20006
(202) 822-9699

Ms. Minnie M. Kenney
Director, Equal Employment Opportunity
National Security Agency
Room 2B7114
9800 Savage Road
Ft. Meade, MD  20755-6000

Re: EEO Case of Margaret Tildon
Case No. 90-041

Dear Ms. Kenney:

In your letter of 22 March 1991, you indicated acceptance of four issues raised by the EEO complaint filed by my client, Margaret I. Tildon, on 23 September 1990. I wrote you on May 21, 1991, to inquire about when the case would be assigned to an investigator, but there has been no response to my letter.

Ms. Tildon initiated this matter on April 4, 1990, and filed her formal complaint nine months ago. As you know, since more than 180 days have elapsed without a final decision by the agency, she has the option now of filing the complaint in federal court.

One would think that the agency would want to resolve this expeditiously and inexpensively through the administrative process. However, Ms. Tildon's patience in waiting for an investigation of this case has been stretched beyond reasonable limits and she is inclined to pursue this in court.

As repeatedly stated, we are quite concerned that Ms. Tildon continues to have difficulty in obtaining a transfer within NSA or a different position with another agency. Perhaps the discrimination against her has extended to bad-mouthing her when she applies for jobs.

Sincerely,

Alan Banov

AB/sf
cc: Ms. Margaret I. Tildon ✓
    Office of General Counsel, NSA

I complained to my team chief, Tina Hower, this morning about yesterday and how I left work with a headache and very frustrated with what happened. She then suggested that I write it all down.

On October 31, 1991 at approximately 7:30 in the morning my team chief Tina Hower gave another member of our team a job request to be completed, this other member was Margaret Tildon. At approximately 8:30 in the morning Margaret came up to me and said that she didn't understand what she was supposed with the request, with written instuctions to come to me, Denise Bishop for help. I informed Margaret that the request was for a PFBK (platform feedback) run to be started. Margaret said that she didn't know how to do these. This statement is not true for she has done them in the past.

I gave Margaret a quick run down on how to go about setting up the ▬▬▬▬ member, finding out which system they wanted the pfbk run on and what the name of the file was to be. At approximately 10:15 ▬ group phoned and informed me that someone was creating a bogas dataset on ▬▬▬▬ After checking on this I found that it was Margaret who was creating the dataset. I informed her that she was leaving in a pfbk rename portion of the jcl that shouldn't have been run. This was written on a note since she wasn't at her desk at the time. After returning Margaret called me over and said she couldn't understand why she couldn't look at the dataset she was trying to create and I showed her what had to be changed within the jcl. I then said to her "don't you remember having to change the temporary dataset to be a permanent one so it could be cftp'd to the person's terminal", Margaret then rolled her eyes, shook her head and said that she didn't know this kind of programming. I then asked her where her typed instructions were on how to do PFBK's (these instructions contain every bit of information needed to be able to set up and run PFBK's). Margaret said that she didn't have any instructions and I said yes you do because Tina gave us both a set at the same time. Finally she located them and started reading them over. I then got another note stating that she couldn't "con" to the user's terminal because she didn't have the passwd. I asked our Sun system administrator to either login for her or give her the password, which I believe he gave her the password (this was at approx. 12:15). At 1:30 I decided to check behind what Margaret was doing to see if she was doing everything by the instructions and she was not. I telnetted over to the user's terminal to check his .goodname and .day files which have to be set up correctly for the pfbk to run, and neither were correct. By 2:00 when Margaret leaves for the day the job request was still NOT completed! I would like to add that setting up a PFBK should ONLY take about half an hour at the most. I don't appreciate being asked repetitive questions about the same thing over and over again, ESPECIALLY when she has step by step instructions right in front of her!! I decided to inform our team chief of this incident with the hopes of not being assigned to work with her on this again.

                                        DENISE A BISHOP

Ms. Tildon called in
8/4/93     5:10 pm

Diane Lucas from the Navy
came in + told Ms.
fellow went into to see
Mr. Wert. Elder
Carnahan told Ms.
Wert " Was there
something they could
get on Ms. Tildon?"
— This was overheard by
Diane Lucas (@ 1:30pm)
(Diane sits by Mr. Werts
door).

— Diane knew they had tried
to get on another black guy
@ month ago

Memorandum for the Record

Subj: Meeting with Margaret Tildon

On November 23, I met with Margaret Tildon of A2 to discuss possible reassignment to A7. I explained to Ms. Tildon that, as a programmer, her logical reassignment in the A Group reorganization would be to the new A7 organization. I briefly described the A71 Direct Support element and the kinds of tasks I expected A71 personnel to perform. I asked Ms. Tildon to describe her current job responsibilities.

Ms. Tildon informed me that she is currently involved in litigation against NSA. She believes that she was hired to do "business programming", which is distinctly different from the kinds of programming required to support DDO production elements. She told me that she does not want to be assigned to A7 or even A Group; she desires a position in a business–oriented element of the agency. She stated that, for a number of months, she has had no assigned responsibilities in A2. Ms. Tildon informed me that it is her desire to leave the agency when her litigation is satisfactorily settled.


_Patricia H. Fauver_                    _2 Dec 93_
Patricia H. Fauver                      Date

_Margaret Tildon_                       _2 Dec 93_
Margaret Tildon                         Date

_Robert H. Semmes_                      _2/12/93_

1

UNITED STATES GOVERNMENT

# memorandum

DATE:  **6 December 1993**

REPLY TO
ATTN OF:  **O1**

SUBJECT:  **Affidavit of Mr. James E. Wiseman, III**

TO:  **OGC, Mr. Larry Price**


Pursuant to your request on 3 December 1993, attached is the
signed affidavit of Mr. James E. Wiseman, III, dated 6 December 1993.


*Parris F. Williams*

**PARRIS F. WILLIAMS**
**EEO Officer/Investigator**
**Office of Equal Employment Opportunity**


**Encl:**
  **a/s**

**AFFIDAVIT**

State of Maryland

County of Anne Arundel

SSN:  235 62 8690

I, James E. Wiseman III, White Male, Manager, GGD-15, Deputy

Chief, Corporate Computer Operations and Support Division, National

Security Agency, Fort George G. Meade, MD., 20755-6000

hereby solemnly (swear) ~~(affirm):~~  *do*

In accordance with Public Law 93-579 (Privacy Act 1974), as

an individual furnishing information for inclusion in a system

of records, I have been informed:

EFFECTS OF NONDISCLOSURE:  Disclosure of information by me

is voluntary; however, my failure to respond will result in a

recommended disposition of the case on the basis of the

information available.

AUTHORITY:  The authority for the collection of information

requested in this interview was derived from one or more of the

following:  Title 5, Code of Federal Regulations, Sections 5.2

and 5.3; Title 29, Code of Federal Regulations, Section

1614.108; Title 5, U.S. Code, Sections 1303 and 1304; Title 42,

U.S. Code, Section 20003-16 and; Executive Order 11478, as

amended; and Federal Personnel Management Letter 713-42.

Page 2 of 3  Deponent's initials *gew*

PURPOSES AND USES:  The information supplied will be used as part of the record in an equal employment opportunity discrimination complaint.  The record will be furnished to designees of agencies and departments of the Federal Government in order to resolve the complaint.  The record may also be disclosed to any agency of the Federal Government having oversight or review authority with regard to the Equal Employment Opportunity Commission or National Security Agency, to the federal intelligence agencies, or to others as published in the Federal Register.

The interview upon which this affidavit is based was conducted on 6 June 1993, in the Equal Employment Opportunity (EEO) Office, Operations Building 2B, Room 7114, Fort George G. Meade, Maryland. I have been informed that Ms. Margaret I. Tildon (SSN: 577 66 5690), while an employee of the National Security Agency, filed a formal complaint of Race and Handicap discrimination on 23 September 1990, alleging that she was subjected to illegal discrimination when: (1) she was not selected for two job vacancies; (2) job assignments/tasks within the Military Forces Office were given to others and not to her; (3) her treatment on the job was different when compared to others; and (4) asked to perform duties which her medical condition would not permit.  I have been told that I am being interviewed in conjunction with this

Page 3 of 3  Deponent's initials *JEW*

investigation because I may have information germane to some of the issues raised by Mrs. Tildon.

I am the former Chief, Resources and Financial Management Software Systems Division, Processing Software Office, National Security Agency, Fort George G. Meade, MD., 20755-6000.

I do not know, nor do I recall ever meeting Ms. Tildon.

To the best of my knowledge, I do not recall ever reviewing Ms. Tildon's Personnel Summary.

I have read the above statement, consisting of 3 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to parties having a direct interest in the action to which this statement is related.

*James E Wiseman III*
(Deponent's signature)

Subscribed and (sworn to) ~~(affirmed)~~

before me at Fort George G. Meade, Maryland

on this 6 day of December , 19 93

*Carris F. Williams*
(Investigator's Signature)



**NATIONAL SECURITY AGENCY**
**CENTRAL SECURITY SERVICE**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: AGC(Lit)-228-94
8 April 1994

Judge Erin E. Powell
Equal Employment Opportunity Commission
1400 L. Street, N.W.
Suite 200
Washington, D.C. 20005

        Re: EEOC No. 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X, Agency No. 90-041

Dear Judge Powell:

    Enclosed is a copy of the transcript from the settlement hearing in Margaret Tildon's EEO case. I have also enclosed a copy of the proposed settlement agreement. The problem with settlement centered around item 3 in the settlement agreement. Mr. Jackson is unwilling to sign a statement without a qualification that he still does not believe Ms. Tildon has experience with COBOL and C programs. However, the Agency has proposed to totally remove the affidavit of Mr. Jackson from the EEO casefile. This action would seem to be more advantageous to Ms. Tildon as the offending affidavit would thus cease to exist. In the alternative, I am willing to sign a stipulation that "Contrary to Mr. Jackson's affidavit, Ms. Tildon's Personnel Summary did reflect experience with COBOL and C programing." As a last option, the Agency is willing to redact specific comments in Mr. Jackson's affidavit.

                    Sincerely,

                    *Larry Price*

                    LARRY W. PRICE
                    Agency Representative

Encl:
    a/s

Copy Furnished:
Mr. Charles Pearson
1919 Pennsylvania Avenue, N.W.
Washington, D.C. 20006

EXHIBIT 31

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

MARGARET I. TILDON                    :

    Plaintiff,                    :

v.                                    :
                            : Civil No. WMN-95-3706

JOHN M. MCCONNELL,                    :
  Vice Admiral,
  Director,                           :
  National Security Agency
                             :

    Defendant.                        :
_____:

## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, through counsel, and opposes defendant's motion because there are genuine issues as to material facts, thereby defeating defendant's claim that he is entitled to judgment as a matter of law on all claims.  The grounds for the Opposition are set forth in the supporting Memorandum.

Respectfully submitted,

TEMPLE LAW OFFICES,

By: _____
    Jeanett P. Henry
    1200 G St., NW; Suite 370
    Washington, D.C. 20005
    (202) 628-1101
    Attorney for Plaintiff

-2-

Certificate of Service

    I hereby certify that on this 31st day of January, 1997 and copy of the Opposition and supporting Memorandum was sent by first-class mail, postage prepaid to:

Charles J. Peters, Esquire
Assistant United States Attorney
604 United States Courthouse
101 West Lombard Street
Baltimore, MD 21201-2692


Jeanett P. Henry

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

MARGARET I. TILDON          :

    Plaintiff,              :

v.                          :    Civil No. WMN-95-3706

JOHN M. MCCONNELL,          :
  Vice Admiral,
  Director,                 :
  National Security Agency
                     :

    Defendant.              :
_____ :

## MEMORANDUM IN SUPPORT OF
## OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### Standard of Review

In considering a motion for summary judgment, a court must consider whether the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue of material fact, and whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, all of the facts must be viewed in the light most favorable to the non-moving party and all reasonable inferences must be drawn in favor of the non-moving party. Id. at 256, 106 S.Ct. at 2514; Matsushita Elec. Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Once the moving party has met the initial burden of demonstrating the absence of a genuine issue of material

-2-

fact, the non-moving party must establish the existence of each element of its case. J.F. Feeser, Inc. v. Serv-A-Portion, Inc., 909 F.2d 1524, 1531 (3d Cir. 1990), cert. denied, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) (citing Celotex at 323, 106 S.Ct. 2548, 2552-53 (1986).

In discrimination cases motive is often the crucial issue and, thus, the Court must take special care when considering a motion for summary judgment. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.) cert. denied, 484 U.S. 897, 108 S.Ct. 232, 98 L.Ed.2d 191 (1987). Applying this standard to the facts of the record here, the Court should deny summary judgment on plaintiff's claims of racial and handicap discrimination.

## ARGUMENT

In Title VII cases, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Once she makes out a prima facie case, a presumption exists that the employer unlawfully discriminated against her. See Texas Dept'. of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The employer may rebut this presumption by advancing a legitimate nondiscriminatory reason for failing to promote her. Should the employer succeed, the presumption drops from the case. Id. at 255, 10 S.Ct. at 1094. Tildon must then demonstrate that the employer's reasons are merely pretextual or are unworthy of

-3-

credence and the real motive for the failure to promote is her race and/or disability. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

## I.    Prima Facie Case on Non-Selection Claims

In order to establish a prima facie case, Tildon must show that: (1) she is a member of a protected class; (2) she applied for the position in question; (3) she was qualified for the position in question; and (4) she was rejected for the position under circumstances giving rise to an inference of unlawful discrimination. Amirmokri v. Baltimore Gas & Electric Company, 60 F.3d 1126, 1129 (4th Cir. 1995). Plaintiff makes a prima facie case as to both positions she applied for and was rejected: Computer Programmer position in ADP Analytic Support Division and the Computer Programmer position in the Research and Exploitation Division.

Defendant does not contest the first two elements for plaintiff establishing a prima facie case. However, defendant argues that Tildon was not qualified for the positions at issue and there was no evidence of discrimination. These two points of contention make these claims of non-selection inappropriate for summary judgment.

## A.    Computer Positions

Plaintiff need only establish that she met the minimum

-4-

qualifications for the position. <u>Mitchell v. Baldridge</u>, 759 F.2d 80
(D.C. Cir. 1985); <u>Lynn v. Regents of the University of Cal.</u>, 656
F.2d 1337, 1342 (9th Cir. 1981), *cert. denied*, 459 U.S. 823 (1982).
The job announcement invited applicants at the GS-7 level; Tildon
was already at the GS-9 level when she applied for the position.
<u>Exh.1</u> at 22.    Moreover, Tildon's credentials satisfied the job
announcement in several respects: she had worked on a UNIX OS
system, SPECOL and proficient in "C" language programming. <u>Id</u>. at
18-19.

Lester White, the selecting official, claimed he did not
select Tildon for the position because she did not meet the
qualifications as outlined in defendant's motion at 14-15.
However, those reasons are merely pretextual or unworthy of
credence because the real motive was Tildon's race.

Significant, Tildon was the only applicant for the position.
<u>Exh. 1</u> at 8-9.  Yet the position was offered to Sherry Bowman, a
white female, a "verbal applicant" whom White deemed qualified.
White admitted that Bowman was less experienced (6 months) than
Tildon (2 years). <u>Id</u>. at 17.   To justify his selection, White
emphasized that Bowman would be "professionalized" when she
graduated from the intern program, yet the job announcement at
issue did not require applicants to be "professionalized", nor were
all the employees under his supervision "professionalized." <u>Id</u>. at
17, 35. Also, White claimed that in looking at Tildon's Personnel
Summary he had no indication that she passed the courses she

-5-

listed, but he never thought to inquire. Id. at 20.

Defendant argues that there is no evidence of unlawful discrimination as to either position because the selecting officials were not aware of plaintiff's race or disability at the time, nor had they discussed Tildon with anyone else. Tildon knows that White called her office to speak with her Branch Chief because Tildon took the message, a nd shortly thereafter she received the rejection notice. Exh. 2 at 25-26. Even though Matthews and White claim they never met Tildon, it is reasonable to infer that they presumed she was African American by virtue of the schools listed on her Personnel Summary: Howard University and the University of the District of Columbia. Indeed, Richard Jackson, whom defendant regards as credible, determined that Tildon is a "minority" from the schools she attended. Exh. 3 at 56.

Defendant makes much ado about Richard Jackson, an African American employee who allegedly mentored Tildon, also concluding that she was not qualified for the position. But in arriving at that determination, Jackson did not consider Tildon's COBOL experience listed on her Personnel Summary, claiming he "miss that." Exh. 3 at 19.

The foregoing demonstrates that Tildon was qualified for the positions she applied for and she was rejected under circumstances giving rise to an inference of unlawful discrimination. Thus she has satisfied her burden of establishing a prima facie case, precluding summary judgment on these claims of racial

-6-

discrimination.

## B. __Discriminatory Discipline__

Tildon was subjected to discriminatory discipline on the basis of both her race and handicap when Celestine Hower issued the Informal Counseling on July 20, 1989. This constituted adverse action because it was subsequently referred to in a Supervisory Evaluation hastily arranged for purposes of requesting a medical evaluation. Exh. 4. "When a supervisor, acting in his official capacity, deliberately places an inaccurate, discriminatory evaluation into an employee's file, he intends to cause harm to the employee." Stoller v. Marsh, 682 F.2d 971 (D.D.C. 1982).

Noteworthy, in that Supervisory Evaluation, the author concluded that Tildon lacked "ambition and drive that may be related to her physical handicap" and that "as her supervisor, I do not see a potential for advancement above her current position." Exh. 4. In addition it noted that "[i]n order to get a true picture of her attitude and physical state one should read the informal counseling and rebuttal dated July 20, 1989 in its entirety." Id. Thus Hower's Informal Counseling Statement to Tildon was no small matter because it later factored into Tildon's evaluation and ultimately affected her ability to gain employment elsewhere, inside and outside the agency. Moreover, Tildon was the only employee to receive an Informal Counseling despite the fact that other non-minority employees were witnessed sleeping at their

-7-

desk, taking long lunch breaks, arriving late to work, and never changing computer ribbons. Exh.2 at 21.

Subjective evaluations involving white supervisors provide a ready mechanism for racial discrimination. Parson v. Kaiser Aluminum & Chemical Corp., 575 F.2d 1374, 1385 (5th Cir. 1978); Rowe v. General Motors Corp., 457 F.2d 348, 359 (5th Cir. 1972); Harris v. Birmingham Bd. of Ed., 712 F.2d 1377 (11th Cir. 1983). This is because the supervisor is left free to indulge a preference, if he has one, for one race of workers over another. Miles v. M.N.C. Corp., 750 F.2d 867, 871 (11th Cir. 1985). In addition, subjective and vague criteria may be insufficient reasons given by an employer for its failure [to rehire] because such criteria do not allow a reasonable opportunity for rebuttal.

Without question, Hower exercised tremendous subjectivity in issuing the Informal Counseling to Tildon. Hower admitted that she was "not real familiar" with the Personnel Policy Manual; she had no guidelines to develop the statement in the first place; she did not look at the agency counseling guidelines nor talk to anyone in personnel about how to conduct informal counseling. Exh. 5 at 33, 38, 39.

## C.   Discrimination in Job Assignments/Tasks

When Tildon came under Hower's supervision, Tildon was hired as a computer programmer, yet she did very little to no programming. In fact, Debbie Webb received the preferred

-8-

assignments such as SPECOL and M-204. Defendant's Motion, Exh. 1.
Defendant posits as its non-discriminatory reasons for this
disparity is assignments that Webb was a "M-204 expert" and was
assigned to supervise and teach the plaintiff M-204. Indeed, Webb
is not a computer programmer, like Tildon, but came into the
department to get into the data flow area. Exh. 6 at 5. While
Tildon has both a Bachelors and Masters degrees in addition to
several years of course work and experience in computer
programming, Webb has no degrees and "started right out of high
school." Id. at 16. The clear inference is that Hower gave
preferential work assignments to Webb over Tildon based on
discriminatory reasons.

It should be noted that Hower never socialized with Tildon,
however she socialized repeatedly with Debra Webb. Id. at 52. In
fact, Hower became friends with Webb in two (2) months, while over
the course of six (6) months in knowing Tildon, Hower never went to
lunch with her. Id. at 53-55. In Morris v. Telecom, 773 F. Supp.
490, 494 (1991), the court found that "where the plaintiff offers
evidence that [defendant supervisor] has no black friends, it seems
to suggest that this along with preferential treatment of his
younger white buddy, indicates an exclusive system which evidences
discrimination against older Black females." As this court well
knows, "impermissible discrimination exist even if bias is merely
a contributing factor rather than a sole factor in an employer's
decision." Coleman v. Missouri Pc. R. Co., 622 F.2d 408, 410 (8th

-9-

Cir. 1980).

The foregoing raises genuine issues of material facts, making summary judgment unwarranted under these facts.

## D.    **Discrimination Based on Handicap**

The American With Disabilities Act ("ADA") prohibits discrimination against qualified people with disabilities. A disability is : (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. Section 12101(2)(A). Courts must make these determinations on a case-by-case basis. Smaw v. Commonwealth of Virginia, 862 F.Supp. 1469 (E.D.Va. 1994).

Defendant contradicts itself when it asserts that Tildon does not have a handicap within the meaning of the law. Indeed, in September, 1989 defendant's own Medical Center confirmed that she has a handicap, enumerated restrictions, and directed that Tildon be re-evaluated a year later, by September 7, 1990. Exh. 7. Hower, plaintiff's supervisor, acknowledged that she knew that Tildon had "all kinds of medical problems" and was prohibited from pushing and lifting anything heavy. Exh. 5 at 41. Despite the medical recommendation that Tildon be re-evaluated in a year, a request for medical re-evaluation came a little over a month later, November 7, 1989. Id. at 49. Not surprisingly on March 26, 1990 came a

-10-

response recommending that Tildon return to full duty without restrictions, claiming that she was "playing the system." Exhibit 8. Defendant put in place a course of events that to insure that Tildon was no longer characterized as handicap - all toward the goal of refusing to have to accommodate her.

Even if Tildon is not deemed to have an impairment substantially limiting one or more of her major life activities, which she does not concede, defendant certainly regarded her as having such an impairment and treated her accordingly. Thus, defendant's quest for summary judgment on this claim also fails.


**CONCLUSION**

Based on the foregoing, plaintiff submits that defendant has failed to meet its burden for a grant of summary judgment. Therefore, the motion should be denied.


Respectfully submitted,

TEMPLE LAW OFFICES,


By: Jeanett P. Henry
Jeanett P. Henry
1200 G St., NW; Suite 370
Washington, D.C. 20005
(202) 628-1101
Attorney for Plaintiff

*12-12-97*
*Cal 6*

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

CASE NO. CA *6818 - 97*

*Cal 6 Initial Order*

*Margaret I. Gildon*

vs.

*Charles G. Pearson*

**RECEIVED**
~~Plaintiff~~
Civil Clerk's Office

**NOV. 07 1997**

Superior Court of the
District of Columbia
~~Defendant(s)~~

**AFFIDAVIT OF SERVICE BY SPECIAL PROCESS SERVER**

I, *GARY D. DEW* having been duly authorized to make service of the Complaint and Summons in the above

entitled case, hereby depose and say:

That I am not a party to or otherwise interested in this suit.

That my age and date of birth are as follows: *42*

That my residential address is:

That my business address is: *331-8th St N.E., Washington DC*

That at *9:45* o'clock *P.* M. on the *5* day of *NOV,* 19*97* I served the within named

defendant *Charles G. Pearson*    ( *PERSONALLY* )

~~(personally by leaving~~ a copy of the Complaint and Summons at his - ~~her~~ usual place of ~~employment~~, of abode at

*2151- N Amrit Lane, Temple Hills Md* , Washington, D. C.

~~a person of suitable age and discretion, then residing therein) as directed by the Plaintiff, under~~ Superior Court

Rule 4.

DESCRIPTION: Sex *M* , Race *B* , Aprox. Age *49/51* ,
Approx. Height *6'2* , Approx. Weight *180* ,
Other *GOTEE THIN -MED COMP.*

Subscribed and sworn to before me this ____ day of *= 7 NOV 1997* , 19____

*Bernice E. Stone*
**STONE'S LEGAL SERVICES**
**PROCESS SERVER'S**

BERNICE E. STONE
NOTARY PUBLIC, DISTRICT OF COLUMBIA
My Commission Expires December 15, 1997

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

## CIVIL DIVISION

```
                                          F I L E D
                                       CASE MONITORING OFFICE

                                          MAY 2 8 1998

                                          Superior Court
                                      of the District of Columbia
                                          Washington, D.C.
```

MARGARET I. TILDON
_____
                        Plaintiff(s)

VS.                                      Civil Action No. __6818-97 (F)__

CHARLES Q. PEARSON                                    CALENDAR-6
_____
                        Defendant(s)


## ARBITRATION JUDGMENT

Arbitrator having made a final conclusion pursuant to Arbitration Rule X(10), it is

this_____28th_____ day of_____May_____, 19_98_____,

**ORDERED**

That Arbitration Judgment is entered for the Plaintiff(s)_____

_____MARGARET TILDON_____

against the Defendant(s)____CHARLES Q. PEARSON_____

in the amount of $___6,102.70_____ with interest at the rate of_____6_____ per cent

per annum from_____May 28, 1998_____ and costs of this action.


COPIES TO:   **MAY 2 8 1998**              MARC S. MOSKOWITZ, ESQUIRE
Charles Q. Pearson, Pro-Se                          **Arbitrator**
Margaret I. Tildon, Pro-Se
                                         BY _____
                                                    **Deputy-Clerk**


                          **DOCKETED  MAY 2 8 1998**

EXHIBIT 10

Form CV-1986/Jan 92
021276